IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 17, 2017 Session

## LORNA MAE GIBSON v. CHARLES WILLIAM BIKAS

**Appeal from the Chancery Court for Hamilton County**
**No. 17-0197      Pamela A. Fleenor, Chancellor**

_____

### No. E2017-00883-COA-R3-CV

_____

This case involves an order of protection sought by the petitioner against the respondent, who is the petitioner's brother-in-law, on behalf of the petitioner and her two minor daughters. The petitioner previously had obtained an order of protection that had expired in May 2016. On March 24, 2017, the petitioner filed a petition seeking a one-year, no-contact order of protection, alleging that, *inter alia*, since entry of the prior order, the respondent had repeatedly attempted to influence her by following through on threats to obtain custody of the petitioner's two minor daughters. The trial court initially granted an *ex parte* order of protection as to the petitioner but denied the petition as to the children, questioning whether standing existed because the petitioner did not at that time have physical or legal custody of her daughters. Following a subsequent bench trial, the trial court found that the petitioner had standing to petition for an order of protection on behalf of her children pursuant to Tennessee Code Annotated § 36-3-602(b). Also finding that the respondent posed a danger to the petitioner and her children, the trial court extended the *ex parte* order into a one-year, no-contact order of protection against the respondent on behalf of the petitioner and modified the order of protection to include the petitioner's children. The court also awarded to the petitioner reasonable attorney's fees. The respondent appeals. Discerning no reversible error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Charles William Bikas, Chattanooga, Tennessee, Pro Se.

Emily Brenyas, Chattanooga, Tennessee, for the appellee, Lorna Mae Gibson.

**OPINION**

## I. Factual and Procedural Background

At issue on appeal is an order of protection sought by the petitioner, Lorna Mae Gibson, against the respondent, her brother-in-law, Charles William Bikas. Ms. Gibson had obtained a previous order of protection, which was granted by the Hamilton County Chancery Court ("trial court"), with Chancellor Pamela A. Fleenor presiding, on May 19, 2015 ("2015 OP"). Although the 2015 OP is not in the record on appeal, it is undisputed that in the 2015 OP, the trial court required Mr. Bikas to have no contact with Ms. Gibson or her two minor daughters ("the Children"), who were six and two years of age at the time the 2015 OP was entered. The 2015 OP expired on May 19, 2016, without Ms. Gibson's having filed a petition for an extension.

The series of events underlying the 2015 OP began in the fall of 2014 when a referral was called in to the Department of Children's Services ("DCS") against Ms. Gibson, who had been residing with the Children. At the time of the DCS referral, the Children were placed in the temporary custody of Ms. Gibson's sister, Jessica Bikas, and her sister's husband, Mr. Bikas. After approximately two months, Mr. and Ms. Bikas separated, and Ms. Bikas filed a petition for an order of protection against her husband, alleging that he had threatened violence against her if he lost custody of the Children. In March 2015, the youngest child, N.M., was placed with paternal relatives, and the oldest child, A.W., entered DCS custody and was placed with non-relative foster parents. It is undisputed that Ms. Bikas's petition for an order of protection was subsequently dismissed.

Later in the spring of 2015, Mr. Bikas, still separated from Ms. Bikas, co-signed a lease with Ms. Gibson concerning an apartment. Ms. Gibson subsequently alleged that Mr. Bikas repeatedly tried to coerce her into a romantic relationship by threatening to remove his name from the lease and threatening to take legal action to obtain custody of the Children. Ms. Gibson filed the petition for the 2015 OP the day after Mr. Bikas allegedly stayed overnight in her apartment without permission and allegedly sexually molested her. Although on appeal in this action, Mr. Bikas vehemently denies Ms. Gibson's allegations underlying the 2015 OP, he acknowledges that he consented to the trial court's entry of the original order without an evidentiary hearing. Mr. Bikas asserts on appeal that he agreed to the 2015 OP "so that he could break the apartment lease" with Ms. Gibson.

In the meantime, A.W. was residing in the spring of 2015 with her foster parents within the same school district where she had previously lived with Ms. Gibson. A.W. resumed attendance at the elementary school where she previously had been a student,

and she resumed speech and language therapy with Ginger Vitrano, a speech and language pathologist who had provided therapy to A.W. in the past. Ms. Vitrano testified in this matter that she became concerned after observing changes in A.W.'s behavior, particularly changes denoting sexually reactive behavior. Ms. Vitrano subsequently applied with DCS to provide a foster placement for A.W. Upon approval, Ms. Vitrano provided foster care to A.W. for approximately eighteen months. A.W. was eventually placed in the custody of her biological father, who is not a party to this action. Ms. Gibson's younger daughter has remained in her original foster placement since the Children's removal from Ms. Gibson's home. At some point in 2015, Mr. and Ms. Bikas reconciled.

Ms. Gibson commenced the instant action, initially acting *pro se*, by filing a petition for an order of protection against Mr. Bikas on March 24, 2017. She again sought a one-year order requiring Mr. Bikas to have no contact with her or the Children, who were by then eight and four years of age. In her petition, Ms. Gibson repeated the factual allegations underlying the 2015 OP and averred that since entry of the 2015 OP, Mr. Bikas had continued his attempts to harass and influence her by repeatedly attempting to gain custody of A.W. for allegedly illicit purposes.

Upon Ms. Gibson's petition, the trial court, with Chancellor Jeffrey M. Atherton presiding by interchange, entered an *ex parte* order of protection as to Ms. Gibson. The court denied an *ex parte* order of protection as to the Children and set a hearing for April 3, 2017, directing Ms. Gibson to show cause why the Children required protection from Mr. Bikas. The court stated the following in this regard: "Question exists as to standing as children do not appear to be in physical or legal custody of [Ms. Gibson]."

By the time of the April 3, 2017 hearing, Ms. Gibson was represented by her current counsel, and Mr. Bikas was represented by attorney Mark Whittenburg. Following a hearing, during which Ms. Gibson's counsel requested a continuance because Ms. Gibson had been involved in an automobile accident while on her way to the courthouse, the trial court, with Chancellor Fleenor again presiding, entered an order resetting the hearing for April 10, 2017. Although Mr. Bikas insists on appeal that he did not agree to this continuance, the trial court's order memorializing the grant of continuance, entered on April 7, 2017, states that it did so upon the facts underlying Ms. Gibson's absence and "agreement by the Parties."

The trial court then conducted a bench trial on April 10, 2017, during which the court heard testimony from the parties, Ms. Bikas, and Ms. Vitrano. Attorney Laura E. Banks, who had been appointed as a guardian *ad litem* ("GAL") to represent the Children's best interests in the separate custody case, appeared on behalf of the Children. Ms. Gibson testified regarding the allegations underlying the 2015 OP, stating that Mr.

Bikas had "a bad obsession with [her] and especially [her] oldest daughter, [A.W.]" She further testified that Mr. Bikas "had continuously threatened" to "take [her] name off the lease" of the apartment for which he had co-signed and had told her that once she was homeless, he was "going to go and get custody of [her] child" and she would have "to do what [he said]." Ms. Gibson explained that once the 2015 OP expired, Mr. and Ms. Bikas had filed petitions seeking custody of the Children and termination of her parental rights to A.W. She acknowledged that the Children had been removed from her custody in the past by DCS. She stated that she had not filed for an extension of the 2015 OP due to her own medical condition at the time.

Ms. Gibson also testified that Mr. Bikas had described an incident to her during the time period he and Ms. Bikas had custody of the Children when Mr. Bikas was showering at the YMCA, and A.W. "busted in and grabbed his penis." Ms. Gibson explained that the YMCA had a daycare facility and maintained that she could not understand why Mr. Bikas had not taken A.W. to daycare rather than bringing her near the men's shower room. Ms. Gibson further testified that during the time that the 2015 OP was in effect, Mr. Bikas would walk by the convenience store where Ms. Gibson was working, "just slowly walking, stalking at the work." She acknowledged that the convenience store was on the way to Mr. Bikas's workplace so that she did not believe his walking by the store technically violated the 2015 OP. Ms. Gibson maintained that she was "terrifie[d]" by statements Mr. Bikas had made that he wanted to reunite with her and that she was concerned for the safety of the Children.

Ms. Vitrano testified that in her capacity as a speech and language pathologist with Hamilton County Schools, she had worked with A.W. in the fall of 2014 before A.W. was removed from Ms. Gibson's custody and again when A.W. returned to the same school after she had resided with the Bikases and then been removed from their home. Ms. Vitrano explained that she also had extensive experience observing A.W.'s behavior because she had become A.W.'s foster mother for several months in 2015 after A.W. had left the Bikases' home. When questioned regarding how A.W.'s behavior after living with the Bikases compared to her behavior before being placed with them, Ms. Vitrano stated that although A.W. had been developmentally delayed prior to her placement with the Bikases, she did not display sexually reactive behavior until after that placement. She explained:

> [W]hen [A.W.] was placed with the Bikases and then she came back to our school, she was every single afternoon in the office crying and moaning in her sleep. She would have really bad dreams, and the school secretary spent a lot of time with her up for the front office. She couldn't get along with the other students. She had a lot of sexual reactivity. She would

4

undress herself in the bathroom repeatedly. She would touch herself in class. She would try to touch others. She would touch adults.

Ms. Vitrano also testified that A.W. had indicated to her that Mr. Bikas "took her picture and – of her privates, and that he touched her."

Mr. Bikas testified that except for court appearances, he had not seen Ms. Gibson since she had filed the petition for the 2015 OP. He further testified that he had filed a total of four petitions seeking custody of A.W. First, he and Ms. Bikas filed the initial petition in the fall of 2015 to request custody of the Children when DCS removed the Children from Ms. Gibson and placed them with the Bikases. He indicated that when DCS removed the Children from his home, the removal was due to "marital discord." Second, Mr. Bikas stated that when Ms. Gibson was seeking to regain custody of the Children, she requested that Mr. Bikas file a second petition "in case hers didn't work," but he stated that this second petition was "short-circuited" by Ms. Gibson's petition for the 2015 OP.

According to Mr. Bikas, he and Ms. Bikas filed a third petition for custody of A.W. in March 2015, purportedly on advice of former counsel, but that petition was denied because the 2015 OP was still in effect. He explained that he and Ms. Bikas filed a fourth petition for custody of A.W. in May 2016. Mr. Bikas testified that the juvenile court magistrate had told him in 2015 to refile the petition once the 2015 OP had expired but that then the magistrate had "stabbed him in the back and declined" the May 2016 petition. Mr. Bikas asserted that upon his request for a rehearing of the fourth custody petition before the juvenile court judge, the juvenile court judge had "stalled [him] for six months." Mr. Bikas further testified that he had then appealed the fourth custody petition to the circuit court. When questioned regarding whether he was still seeking custody of A.W. at the time of trial in the instant matter, Mr. Bikas answered in the affirmative and stated that the parties "have trial tomorrow about it in circuit court." Mr. Bikas acknowledged that he previously had "filed a motion saying that [he] hope[d] that [Ms. Gibson], her sister, and [he] could reconcile and be a family again."[1]

Ms. Bikas testified that to her knowledge, Mr. Bikas had not initiated communication with or seen Ms. Gibson since the 2015 OP was entered except for courtroom appearances. Ms. Bikas acknowledged that she had filed a petition requesting an order of protection against her husband on March 18, 2015, in which she had alleged that he told her "if we lost our two nieces as far as custody with him that I needed to watch my back." When questioned by the trial court concerning her allegation against

---

[1] The various custody petitions filed by the Bikases are not in the record on appeal.

her husband, Ms. Bikas responded: "He did so with [Ms. Gibson], but they were angry at the time."

Upon determining that "credible evidence" indicated that Mr. Bikas was currently "a threat to the safety" of Ms. Gibson and the Children, the trial court granted Ms. Gibson's petition in an order entered April 10, 2017 ("2017 OP"). The 2017 OP had the effect of extending the *ex parte* order into a one-year, no-contact order of protection on behalf of Ms. Gibson and modifying the *ex parte* order to include the Children in the one-year, no-contact order. The court had ruled orally during trial that Ms. Gibson's status as a parent afforded her standing to petition on behalf of the Children, pursuant to Tennessee Code Annotated § 36-3-602(b), despite her lack of current legal or physical custody. Finding that Mr. Bikas had done "the things listed in the Petition," the court adopted the allegations in the petition by reference into the 2017 OP. The court further found in the 2017 OP that Mr. Bikas had "stalked" and "threatened" Ms. Gibson and had "sexually molested" and "sexually abused" A.W. The court also ordered Mr. Bikas to pay all court costs and attorney's fees.

Ms. Gibson's counsel filed an affidavit of attorney's fees on April 19, 2017, requesting a total of $864 in attorney's fees and expenses. Mr. Bikas, now acting without benefit of counsel, filed a notice of appeal from the 2017 OP on May 3, 2017. He concomitantly filed a response to the affidavit of attorney's fees, asserting, *inter alia*, that unless this Court were to affirm the trial court's decision, he would not pay any attorney's fees awarded by the trial court. Mr. Bikas also attached to his response several "exhibits" that had not been presented during trial.

Following a hearing conducted on June 19, 2017, the trial court granted Ms. Gibson's motion for an award of attorney's fees and expenses in the amount of $864, entering an order to this effect on June 27, 2017. On appeal, Mr. Bikas asserts in his description of the facts that the trial court denied his request for the June 19, 2017 hearing to be continued without affording him "an opportunity to present his case." He also requests in the conclusion of his principal brief on appeal that this Court "[d]eny the attorney fees for [Ms. Gibson] concerning the April 10th, 2017 hearing." However, Mr. Bikas has not raised an issue regarding the award of attorney's fees in his statement of the issues on appeal. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review.").

We note that the trial court in its order granting attorney's fees stated concerning the timing of the hearing:

> [Ms. Gibson] filed her motion for fees on May 23, 2017, and the motion
> was set to be heard on June 5, 2017. Subsequently [Mr. Bikas] telephoned

6

the Court's office and requested a continuance due to a medical appointment. The Court continued the hearing until the next docket call on June 19, 2017 at which time [Mr. Bikas] failed to appear.

Also in the June 27, 2017 order, the trial court clarified its findings that "after the 2015 OP expired [Mr. Bikas] was stalking [Ms. Gibson] when she was at work" and that Mr. Bikas "had abused the minor child [A.W.]" and "present[ed] an immediate and present danger to the minor child." This appeal followed.[2]

## II. Issues Presented

Mr. Bikas presents the following overarching issue on appeal, which we have restated as follows:

> Whether the trial court erred by granting the April 10, 2017 order of protection against Mr. Bikas on behalf of Ms. Gibson and the Children.

Recognizing that the argument section of Mr. Bikas's principal brief contains several sub-issues within the overarching issue, Ms. Gibson has identified four sub-issues on appeal, which we have similarly restated as follows:

A.    Whether Ms. Gibson had standing to petition for an order of protection on behalf of the Children pursuant to Tennessee Code Annotated § 36-3-602(b).

B.    Whether double jeopardy precluded this civil action.

C.    Whether Ms. Gibson demonstrated by the required evidentiary standard that she and the Children were in need of protection from abuse by Mr. Bikas.

D.    Whether the trial court judge demonstrated judicial bias in entering the April 10, 2017 order of protection.

---

[2] This Court has treated Mr. Bikas's notice of appeal as timely pursuant to Tennessee Rule of Appellate Procedure 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof.").

## III. Standard of Review

We review a non-jury case *de novo* upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000). We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also In re Estate of Haskins*, 224 S.W.3d 675, 678 (Tenn. Ct. App. 2006). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

Furthermore, we recognize that Mr. Bikas is a *pro se* litigant and respect his decision to proceed self-represented on appeal. Parties proceeding without benefit of counsel are "entitled to fair and equal treatment by the courts," but we "must not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe." *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003). This Court must "be mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary." *Id.* Furthermore, "[p]ro se litigants are not . . . entitled to shift the burden of litigating their case to the courts." *Chiozza v. Chiozza*, 315 S.W.3d 482, 487 (Tenn. Ct. App. 2009), *perm. app. denied* (Tenn. May 20, 2010) (quoting *Whitaker v. Whirlpool Corp.*, 32 S.W.3d 222, 227 (Tenn. Ct. App. 2000)).

## IV. Order of Protection

In contending that the trial court erred in granting the 2017 OP, Mr. Bikas specifically argues that (A) Ms. Gibson did not have standing to petition for an order of protection on behalf of the Children when she did not have legal or physical custody of the Children, (B) the legal principle of double jeopardy precluded entry of a subsequent order of protection for the alleged acts underlying the first order, (C) Ms. Gibson failed to meet the evidentiary standard necessary to demonstrate that she and the Children were in need of protection from abuse by Mr. Bikas, and (D) the trial court judge allegedly demonstrated judicial bias against Mr. Bikas throughout the proceedings. We will address each of Mr. Bikas's arguments in turn.

At the outset, it is important to understand the procedural posture of Ms. Gibson's request for an order of protection at the time of trial. Because Ms. Gibson did not petition for an extension of the 2015 OP, she commenced a new action when she filed her 2017 petition. Upon Ms. Gibson's 2017 petition, the trial court granted an *ex parte* order

of protection as to Ms. Gibson but denied the petition as to the Children pending further hearing. Therefore, at the time of trial, the court was considering whether to extend the *ex parte* order of protection into a one-year order as to Ms. Gibson and whether to modify it to include the Children. Tennessee Code Annotated § 36-3-605 (2017) provides in pertinent part:

    (a)    Upon the filing of a petition under this part, the courts may immediately, for good cause shown, issue an ex parte order of protection. An immediate and present danger of abuse to the petitioner shall constitute good cause for purposes of this section.

    (b)    Within fifteen (15) days of service of such order on the respondent under this part, a hearing shall be held, at which time the court shall either dissolve any ex parte order that has been issued, <u>or shall, if the petitioner has proved the allegation of domestic abuse, stalking or sexual assault by a preponderance of the evidence, extend the order of protection for a definite period of time, not to exceed one (1) year</u>, unless a further hearing on the continuation of such order is requested by the respondent or the petitioner; in which case, on proper showing of cause, such order may be continued for a further definite period of one (1) year, after which time a further hearing must be held for any subsequent one-year period.

(Emphasis added.)

       "Abuse" is defined by the appropriate statute in pertinent part as "inflicting, or attempting to inflict, physical injury on an adult or minor by other than accidental means, placing an adult or minor in fear of physical harm, physical restraint . . . ." Tenn. Code Ann. § 36-3-601(1) (2017). "Domestic abuse" is statutorily defined as committing abuse against a "domestic abuse victim," the definition of which includes in relevant part "[a]dults or minors who live together or who have lived together" and "[a]dults or minors who are related or were formally related by marriage[.]" Tenn. Code Ann. § 36-3-601(4), (5)(B), (5)(E). *See also Hall v. Hall*, No. E2013-02227-COA-R3-CV, 2014 WL 4536650, at *4 (Tenn. Ct. App. Sept. 15, 2014). Within the same statutory part, a "[s]exual assault victim" is defined as "any person, regardless of the relationship with the perpetrator, who has been subjected to, threatened with, or placed in fear of any form of rape, as defined in § 39-13-502, § 39-13-503, § 39-13-506 or § 39-13-522, or sexual battery, as defined in § 39-13-504, § 39-13-505, or § 39-13-527[.]" Tenn. Code Ann. § 36-3-601(10). Also within this statutory part, a "[s]talking victim" is defined as "any person, regardless of the relationship with the perpetrator, who has been subjected to,

threatened with, or placed in fear of the offense of stalking, as defined in § 39-17-315[.]" Tenn. Code Ann. § 36-3-601(11).

Regarding the distinction between the burden of proof required to obtain an *ex parte* order of protection and that required to obtain an extension or modification of an *ex parte* order of protection, this Court has explained:

> A party seeking entry of an ex parte order of protection has a significant burden of proof; he or she must demonstrate "[a]n immediate and present danger of abuse to the petitioner." Tenn. Code Ann. § 36-3-605(a). [The respondent] contends [the petitioner] had to carry that burden of proof, to prove an immediate and present danger of abuse to obtain an extension or modification of the order. We, however, find his contention is without merit.
>
> A party seeking a modification or extension of an existing order of protection, which is the case here, has a less onerous burden of proof than that suggested by [the respondent]. The party seeking a modification or extension only needs to prove "the allegation of domestic abuse, stalking or sexual assault by a preponderance of the evidence." *See* Tenn. Code Ann. § 36-3-605(b); *see also Collins v. Pharris,* No. M1999-00588-COA-R3-CV, 2001 WL 219652, at *4 (Tenn. Ct. App. March 7, 2001).
>
> To obtain the modification or extension of the Order of Protection at issue, [the petitioner] had the burden of proving by a preponderance of the evidence, the allegation of domestic abuse, the definition of which includes placing an adult in fear of physical harm. *Collins,* 2001 WL 219652, at *5 (citing Tenn. Code Ann. § 36-3-601(1) (Supp. 2000)).

*Cardwell v. Hutchinson,* No. E2009-02680-COA-R3-CV, 2010 WL 4810671, at *4 (Tenn. Ct. App. Nov. 24, 2010) (quoting *Wadhwani v. White*, No. M2005-02655-COA-R3-CV, 2007 WL 27329, at *3 (Tenn. Ct. App. Jan. 3, 2007)); *see also Hall*, 2014 WL 4536650, at *7.

A. Ms. Gibson's Standing to Petition on Behalf of the Children

Mr. Bikas asserts that the trial court erred by finding that Ms. Gibson had standing as a parent to petition for an order of protection on behalf of the Children despite her lack of legal or physical custody of the Children. Mr. Bikas relies on Chancellor Atherton's initial notation on the *ex parte* order of protection that a "[q]uestion exists as to standing as Children do not appear to be in physical or legal custody of [Ms. Gibson.]" During

trial, when Mr. Bikas's counsel raised the issue of standing, the trial court considered the applicable statute and determined that Ms. Gibson had standing to petition on behalf of the Children pursuant to Tennessee Code Annotated § 36-3-602(b). We agree with the trial court on this issue.

We adhere to the following longstanding principles of statutory interpretation:

When dealing with statutory interpretation, well-defined precepts apply. Our primary objective is to carry out legislative intent without broadening or restricting the statute beyond its intended scope. *Houghton v. Aramark Educ. Res., Inc.,* 90 S.W.3d 676, 678 (Tenn. 2002). In construing legislative enactments, we presume that every word in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. *In re C.K.G.,* 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. *Eastman Chem. Co. v. Johnson,* 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. *Abels ex rel. Hunt v. Genie Indus., Inc.,* 202 S.W.3d 99, 102 (Tenn. 2006). It is only when a statute is ambiguous that we may reference the broader statutory scheme, the history of the legislation, or other sources. *Parks v. Tenn. Mun. League Risk Mgmt. Pool,* 974 S.W.2d 677, 679 (Tenn. 1998). Further, the language of a statute cannot be considered in a vacuum, but "should be construed, if practicable, so that its component parts are consistent and reasonable." *Marsh v. Henderson,* 221 Tenn. 42, 424 S.W.2d 193, 196 (1968). Any interpretation of the statute that "would render one section of the act repugnant to another" should be avoided. *Tenn. Elec. Power Co. v. City of Chattanooga,* 172 Tenn. 505, 114 S.W.2d 441, 444 (1937). We also must presume that the General Assembly was aware of any prior enactments at the time the legislation passed. *Owens v. State,* 908 S.W.2d 923, 926 (Tenn. 1995).

*In re Estate of Tanner*, 295 S.W.3d 610, 613-14 (Tenn. 2009).

Tennessee Code Annotated § 36-3-602(b) (2017) provides:

Any petition filed by an unemancipated person under eighteen (18) years of age shall be signed by one (1) of that person's parents or by that person's guardian. The petition may also be signed by a caseworker at a not-for-profit organization that receives funds pursuant to title 71, chapter 6, part 2 for family violence and child abuse prevention and shelters; provided,

11

however, that a petition signed by a caseworker may not be filed against the unemancipated minor's parent or legal guardian. In such case, unless the court finds that the action would create a threat of serious harm to the minor, a copy of the petition, notice of hearing and any ex parte order of protection shall also be served on the parents of the minor child, or if the parents are not living together and jointly caring for the child, upon the primary residential parent. In cases before the juvenile court where the department of children's services is a party or where a guardian ad litem has been appointed for the child by the juvenile court, the petition may be filed on behalf of the unemancipated person by the department or the guardian ad litem.

The first sentence of this subsection plainly states that a petition filed by an unemancipated minor "shall be signed by one (1) of that person's parents or by that person's guardian." *Id.* Following the first sentence, the subsection provides for other individuals who may sign on behalf of the minor, including a caseworker at a shelter for family violence and child abuse prevention, DCS when the department is a party, or a guardian *ad litem* when one has been appointed. *Id.* Mr. Bikas argues that because Tennessee Code Annotated § 36-3-602(b) provides for service of a petition upon the minor's "primary residential parent," the statute does not apply to a situation in which the parent does not have custody at least as an alternate residential parent. We find this argument unavailing. The portion of the statutory subsection providing for service upon a parent applies to "such case" as in the preceding sentence when a caseworker at a shelter for family violence and child abuse prevention has become involved. *Id.* Upon careful review, we determine that the first sentence of the subsection clearly and unambiguously provides that a petition for an order of protection filed by an unemancipated minor shall be signed by the minor's parent or guardian without adding any requirement that a parent must have legal or physical custody to sign on behalf of the child. The trial court did not err in finding that Ms. Gibson had standing to petition for an order of protection against Mr. Bikas on behalf of the Children.

## B. Double Jeopardy

Mr. Bikas also asserts that the trial court erred by placing him in "double jeopardy" when the court considered the events leading to the 2015 OP as well as the events occurring since entry of the 2015 OP. Ms. Gibson responds by noting that double jeopardy is a concept of criminal law that does not apply to a civil action. We agree with Ms. Gibson on this issue.

As this Court has recently explained:

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution protects individuals from being "'subject for the same offense to be twice put in jeopardy of life or limb.'" *State v. Watkins*, 362 S.W.3d 530, 540 (Tenn. 2012) (quoting U.S. CONST., amend. V). Our Supreme Court has explained that the Double Jeopardy Clause has been interpreted to provide three separate protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *Id.* at 541. The protections that the Double Jeopardy Clause provides show that it applies only to defendants in criminal proceedings. Because the current proceeding is a civil proceeding, the concept of double jeopardy cannot come into play. *See State v. Reese*, No. E2002-02003-CCA-R3-CD, 2003 WL 22697352, at \*3 (Tenn. Crim. App. Nov. 14, 2003) (noting that protective orders granted pursuant to Domestic Abuse Statute are civil, not criminal, in nature).

*Gillett v. Molthan*, No. M2016-01628-COA-R3-CV, 2017 WL 1535104, at \*8 (Tenn. Ct. App. Apr. 27, 2017). Similarly, because the instant action seeking an order of protection is a civil proceeding, the concept of double jeopardy is inapplicable. Mr. Bikas is not entitled to relief on this issue.

In this vein, we note that Mr. Bikas may intend to present an argument, raised by his counsel during trial, that the factual allegations underlying the 2015 OP were not relevant to Ms. Gibson's 2017 petition and should not have been considered by the trial court. The trial court overruled the objection, stating that the court would allow Ms. Gibson "to lay the foundation" for her allegations concerning Mr. Bikas's behavior since the 2015 OP had expired. We agree with the trial court that the basis of Ms. Gibson's fears, rooted in the events preceding the 2015 OP, was relevant to why Mr. Bikas's actions following entry of the 2015 OP constituted a present danger of abuse against Ms. Gibson and the Children, as alleged in the 2017 petition and expressly found by the trial court. *See* Tenn. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Mr. Bikas is not entitled to relief on this issue.

## C. Applicable Evidentiary Standard

Mr. Bikas also argues that the trial court erred in granting the 2017 OP because Ms. Gibson failed to prove by "clear and convincing evidence" that she and the Children were in need of protection from him. However, as Ms. Gibson notes, the evidentiary

standard for an extension of an *ex parte* order of protection into a one-year order is by a preponderance of the evidence. *See* Tenn. Code Ann. § 36-3-605(b) (providing that if a petitioner "has proved the allegation of domestic abuse, stalking or sexual assault by a preponderance of the evidence," an *ex parte* order of protection may be extended for a "definite period of time, not to exceed one (1) year," although the order may be extended again with a subsequent petition and hearing); *see generally Sikora v. Vanderploeg*, 212 S.W.3d 277, 287 (Tenn. Ct. App. 2006), *perm. app. denied* (Tenn. Dec. 27, 2006) (comparing the clear-and-convincing evidentiary standard with the less stringent preponderance-of-the-evidence standard). Upon a thorough review of the record, we determine that the evidence does not preponderate against the trial court's findings that since entry of the 2015 OP, Mr. Bikas had stalked Ms. Gibson and followed through on his previous threats to seek custody of the Children. The evidence also does not preponderate against the trial court's findings that Mr. Bikas had sexually abused A.W. when she was in his custody and thereby presented an ongoing threat to the safety of the Children.

In the final judgment awarding attorney's fees, the trial court stated the following specific findings from the April 10, 2017 hearing during which Ms. Gibson prevailed on the order of protection:

> At the April 10, 2017 hearing on the petition for an order of protection, the Court found [Ms. Gibson] and the teacher [Ms. Vitrano] to be credible witnesses.[3] The Court did not find [Mr. Bikas] to be credible. The Court found [Ms. Bikas] to be biased and afraid of angering her husband.

> The Court heard for the first time testimony from [Ms. Gibson] of an incident of child abuse at a YMCA. [Ms. Gibson] testified that [Mr. Bikas] disclosed the facts of the incident to her. [Mr. Bikas] testified in opposition both to the petition and to much of the testimony, but failed to put on any proof disputing or denying the incident. The Court also heard proof for the first time from a school teacher who had observed the minor child engage in disturbing sexual reactivity behavior. The teacher further testified that the minor child told her about specific instances of conduct by [Mr. Bikas] on Child which the Court found to be sexual abuse. [Mr. Bikas] did not object to the admissibility of this evidence.

---

[3] As Mr. Bikas notes, Ms. Vitrano testified that she was a speech and language pathologist with Hamilton County Schools, not a teacher. However, because Ms. Vitrano worked with A.W. in an official capacity and observed A.W.'s behavior at school, we determine any error in the trial court's description of Ms. Vitrano as a "teacher" to be harmless and of no effect on the trial court's findings or our analysis.

The Court found that after the 2015 OP expired [Mr. Bikas] was stalking [Ms. Gibson] when she was at work. The Court further found that [Mr. Bikas] had abused the minor child and presents an immediate and present danger to the minor child. Accordingly the Court entered the order of protection and awarded [Ms. Gibson] attorney's fees.

Regarding the evidence presented at trial, Mr. Bikas essentially argues that the trial court erred by finding that Ms. Gibson and Ms. Vitrano were credible while finding that he and his wife were not credible. In contrast to Mr. Bikas's argument, we emphasize that this Court gives great deference to the trial court's determinations of witness credibility. *See In re Abigail G.D.H.*, No. E2011-00118-COA-R3-JV, 2011 WL 3209180, at *5-6 (Tenn. Ct. App. July 26, 2011) ("In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be ignored by us absent clear and convincing evidence against those determinations.") (citing *Jones*, 92 S.W.3d at 838); *see also In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) ("When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues.").

On appeal, Mr. Bikas relies in part on this Court's decision in *Hall*, 2014 WL 4536650, in which this Court reversed the trial court's grant of an extension of the petitioner's order of protection against the respondent, determining that the petitioner "was unable to offer any specific details regarding any occurrence during the year the order of protection was in effect that caused him to fear for his safety or that of his Children if the order were not extended." *Id.* at *8. We determine the instant action to be highly factually distinguishable from *Hall*.

In this case, Ms. Gibson testified that following entry of the 2015 OP, Mr. Bikas had continued to be a presence in her life by repeatedly walking slowly by her workplace when she was there and by following through on his previous threats to attempt to obtain custody of the Children, particularly A.W. Ms. Gibson also testified that Mr. Bikas had told her of the incident occurring at the YMCA locker room when he allegedly had allowed A.W. to be in the men's shower area and to touch him inappropriately. Ms. Vitrano testified to the marked difference she observed in A.W.'s behavior after A.W. had been in the Bikases' custody, expressing concern for the sexual reactivity A.W. demonstrated after residing with the Bikases and describing A.W.'s indication that Mr. Bikas had sexually abused her. As the trial court noted, Mr. Bikas did not present any proof refuting the alleged incident at the YMCA. He did describe filing four petitions seeking to obtain custody of A.W. Although the trial court found Ms. Bikas not to be credible because of her bias and fear of angering her husband, Ms. Bikas did

15

acknowledge that when she filed her own petition for an order of protection against Mr. Bikas in March 2015, she did so on the basis of his threat that she "needed to watch [her] back" if they lost custody of the Children.

During the close of trial after all proof had been presented, the trial court found that Ms. Gibson had "met her burden of proof" required for entry of the one-year order of protection. The court further found that Ms. Gibson was "in fear of [Mr. Bikas] due to his pattern of conduct toward her and her daughters." As to the inclusion of N.M., the younger daughter, in the 2017 OP, the court found that even though no specific testimony had been presented as to N.M., Mr. Bikas had attempted custody actions against N.M. also. The court expressed concern for the safety of N.M. considering "what has been observed in the school and community regarding [A.W.]"

Mr. Bikas also argues that in finding that he had pursued actions to gain custody of the Children as a means of harassing or stalking Ms. Gibson, the trial court "recharacteriz[ed] lawful due process as criminal activity." Again, Mr. Bikas confuses principles of criminal and civil law. Mr. Bikas's argument in this regard is unavailing. Testimony demonstrated that he had repeatedly threatened to attempt to obtain custody of the Children and that he had repeatedly attempted to follow through on those threats. Moreover, testimony demonstrated that Ms. Gibson had cause to fear for the safety of the Children if they were exposed to Mr. Bikas. Upon our careful review, we conclude that the evidence does not preponderate against the trial court's finding that Ms. Gibson had established the need for an order of protection against Mr. Bikas on behalf of her and the Children.

## D. Alleged Judicial Bias

Finally, Mr. Bikas asserts that this Court should vacate the 2017 OP and, if necessary, remand for a hearing before a different judge because the trial court judge allegedly demonstrated bias toward him. However, Mr. Bikas never filed a motion for the trial court judge's recusal pursuant to Tennessee Supreme Court Rule 10B.[4]

---

[4] Regarding the filing of a motion seeking recusal, Tennessee Supreme Court Rule 10B, § 1.01 provides:

> Any party seeking disqualification, recusal, or a determination of constitutional or statutory incompetence of a judge of a court of record, or a judge acting as a court of record, shall do so by a timely filed written motion. The motion shall be supported by an affidavit under oath or a declaration under penalty of perjury on personal knowledge and by other appropriate materials. The motion shall state, with specificity, all factual and legal grounds supporting disqualification of the judge and shall affirmatively state that it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. A party who is represented by counsel is not permitted to file a pro se motion under this rule.

Inasmuch as the issue of recusal was not presented to the trial court, we determine that it is not properly before this Court on appeal. This Court is one "of appeals and errors," and "we are limited in authority to the adjudication of issues that are presented and decided in the trial courts." *Dorrier v. Dark*, 537 S.W.2d 888, 890 (Tenn. 1976).

Moreover, Mr. Bikas provides no extrajudicial basis for the trial court judge to have been biased against him. In his principal brief on appeal, Mr. Bikas delineates a long list of purportedly biased actions that are primarily comprised of rulings against him or procedural delays. *See Watson v. City of Jackson*, 448 S.W.3d 919, 929 (Tenn. Ct. App. 2014) ("Adverse rulings and 'the mere fact that a witness takes offense at the court's assessment of the witness,' do not provide grounds for recusal . . . in light of the 'adversarial nature of litigation.'") (quoting *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001)). Insofar as Mr. Bikas argues that the trial court erred in granting the order of protection based on judicial bias, his argument is without merit.

## V. Attorney's Fees

We recognize that Mr. Bikas has requested, in the conclusion of his principal and reply briefs, that this Court "deny" the attorney's fees awarded by the trial court to Ms. Gibson. We also recognize that Ms. Gibson has, in the conclusion of her responsive brief, requested an award of reasonable attorney's fees and expenses incurred in defending against this appeal. This Court reviews a trial court's award of attorney's fees according to an abuse of discretion standard. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). Likewise, this Court's decision regarding whether to award attorney's fees on appeal is a discretionary one. *Young v. Barrow*, 130 S.W.3d 59, 66-67 (Tenn. Ct. App. 2003).

However, in the instant action, we determine that neither party has properly raised an issue on appeal concerning attorney's fees. As this Court has explained, "Courts have consistently held that issues must be included in the Statement of Issues Presented for Review required by Tennessee Rules of Appellate Procedure 27(a)(4)" in order to be properly before this Court. *See In re Estate of Burke*, No. M2012-01735-COA-R3-CV, 2013 WL 2258045, at *6 (Tenn. Ct. App. May 21, 2013) (quoting *Hawkins v. Hart*, 86 S.W.3d 522, 531 (Tenn. Ct. App. 2001)). Because neither issue is properly before this Court on appeal, we make no determination regarding the trial court's exercise of discretion in awarding what it considered reasonable attorney's fees to Ms. Gibson following the April 10, 2017 hearing, but we also cannot consider Ms. Gibson's request for attorney's fees on appeal.

## VI.  Conclusion

For the reasons stated above, we affirm the trial court's judgment in its entirety, including the award of attorney's fees to Ms. Gibson by the trial court.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.  The costs on appeal are assessed against the appellant, Charles William Bikas.

_____
THOMAS R. FRIERSON, II, JUDGE