IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2022

## JOSEPH CANNISTRA v. WILLIAM CHARLES (BILLY) BROWN

**Appeal from the Circuit Court for Giles County**
**No. 21-CV-11948   Christopher V. Sockwell, Judge**

_____

### No. M2021-00833-COA-R3-CV

_____

This appeal involves a challenge to a circuit court's award to a landlord for a deficiency in lease payments. The landlord and tenant offered conflicting testimony regarding the terms of the parties' agreement. The circuit court judge found the landlord's description of the agreement more convincing than the tenant's and awarded the landlord a judgment in the amount of $9,800 as well as costs. On appeal, the tenant insists the circuit court judge erred in his assessment of the conflicting testimony. We find the trial court's determination to be supported by the record and therefore affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Joseph Cannistra, Pulaski, Tennessee, Pro se.

Robert D. Massey, Pulaski, Tennessee, for the appellee, William Charles (Billy) Brown.

### OPINION

#### I.

What began with a vision for launching an Italian restaurant in Pulaski, Tennessee, ended in a contentious landlord and tenant relationship, unpaid lease payments, and rather bizarrely a wall damaged as a result of a car being driven into it. Joseph Cannistra, the tenant, grew up with an Italian restaurant as the family business. He saw an opportunity to open a mom-and-pop style Italian restaurant where none existed.

Mr. Cannistra, who envisioned building a restaurant on his own land, approached fellow Pulaskian William Brown, a residential and commercial contractor, about the project. This was the start of what began as a positive relationship. Mr. Brown referred Mr. Cannistra to a drafting

company to create blueprints for the restaurant.

In addition to his work as a contractor, Mr. Brown was also the owner of multiple properties that he leased. Mr. Cannistra was interested in renting one of those properties, a building on North Second Street in Pulaski. While the blueprint drafting process was still underway for a new restaurant, Messrs. Brown and Cannistra began a landlord-tenant relationship in October or November of 2016.

The parties diverge over what the initial use of the leased property was to be. Mr. Cannistra indicates the property was initially used for car repairs and that only later was the decision made to convert the space into a restaurant. Mr. Brown asserts the property was to be used as a temporary location for the launch of the restaurant until a new building was constructed. Whatever the initial use of the property, Mr. Brown offered to lease the property for what Mr. Cannistra believed to be a good rental rate of only four hundred dollars per month. Part of the trade-off for the relatively low cost was that Mr. Brown made the building available as-is and with no responsibility for the alterations or maintenance necessary to make the building useable as a restaurant.

During the blueprint drafting process, it became clear to Mr. Cannistra that the costs of a new building were beyond what he was willing to pay. Mr. Canninstra, however, moved forward with the restaurant, deciding to operate on a more permanent basis at the rental location. While the parties disagree regarding the reason for the increase in the monthly payment, they do agree the amount due each month increased from four hundred dollars to six hundred dollars. Mr. Cannistra asserts the increase was specifically to cover additional insurance on the property, which he contends was to be acquired by Mr. Brown given the anticipated increased flow of customers resulting from usage of the building as an Italian restaurant rather than for car repairs. Mr. Brown asserts the increase resulted from the rental property transitioning from serving as a temporary location for the launch of Mr. Cannistra's restaurant while Mr. Brown worked as a builder on a new structure to becoming a more permanent location for the restaurant.

The landlord-tenant relationship between Mr. Brown and Mr. Cannistra began in 2016 with an oral agreement. A written lease agreement followed as the rental of the North Second Street property transitioned from temporary to more permanent in nature. The parties agree that Mr. Cannistra tracked Mr. Brown down at a Home Depot store in March of 2017, asking him to sign a written lease agreement. Mr. Brown reviewed and signed the lease agreement that was presented to him by Mr. Cannistra while still at Home Depot. Mr. Brown did not make a copy of the signed lease; Mr. Cannistra retained the signed document.

With the rented building as the location, Mr. Cannistra operated Mezza Luna Pizza as a family-run business. His wife and stepson were both involved in the business. In operating the restaurant, Mr. Cannistra made modifications to the building, including putting in new black and white flooring. Overwhelmed by the heat in the building, he also added an expensive new air conditioning unit.

The addition of the air conditioning unit was part of what was an emerging split between landlord and tenant. Mr. Cannistra believed himself to be responsible for improvements, such as the flooring and wallpaper, but believed Mr. Brown was responsible for a recurring flooding issue

- 2 -

and the lack of air conditioning.[1] The relationship between landlord and tenant further deteriorated due to missed lease payments. Mr. Cannistra had missed a single lease payment in April of 2017 but began regularly missing lease payments starting in July of 2019. He would miss seventeen months of payments between July 2019 and April 2021. The rental payments that he made during this period were in the amount of six hundred dollars. He did make extra payments of four hundred dollars in May and June of 2020 on top of the monthly six-hundred-dollar payment.

Mr. Cannistra does not contend that he made the missing payments; rather, he connects the stopped payments with Mr. Brown's alleged non-compliance with the terms of their lease agreement. Mr. Cannistra indicates that he inquired of Mr. Chad Alsup, who Mr. Cannistra asserts is the only insurance agent handling commercial insurance in Pulaski, whether Mr. Brown had obtained insurance in connection with the rental building. Mr. Cannistra indicates that Mr. Alsup informed him that Mr. Brown had not insured the property, meaning, in Mr. Cannistra's view, that his six-hundred-dollar payments were too high and that the amount due was instead four hundred dollars. Mr. Brown insists his obtaining insurance was never part of the parties' agreement and that the six-hundred-dollar payment, an increase from the original four-hundred-dollar amount, was related to the shift from a temporary to a more permanent occupancy of the building. In addition to the division over insurance, Mr. Cannistra was also dissatisfied with Mr. Brown's handling of the air conditioning and flooding issues.

During this period of non-payment of rent, Mr. Brown went to see Mr. Cannistra at the restaurant to attempt to collect. While at the restaurant, Mr. Brown observed that one of the building's walls had been significantly damaged. Large blocks of the exterior wall had been knocked loose, a door had been bent, and an exterior wall was partially caved in. As for the cause of this damage, a car had been driven into the wall. Mr. Cannistra blamed his wife, Kim Cannistra. The couple had been experiencing financial problems and had what was described as a "fiery marriage." In addition to informing Mr. Brown that Ms. Cannistra was responsible for the damage, Mr. Cannistra similarly blamed his wife when communicating with local law enforcement at the time of the incident. Ms. Cannistra denied responsibility. She insisted to both a law enforcement officer and her husband that she had been out of town, visiting Asheville, North Carolina, when the damage was done to the building. The investigation ceased.

Mr. Brown filed a detainer action in the Giles County General Sessions Court in October of 2020, seeking possession of the building, unpaid rent, costs, and compensation for the damages to the building. The parties' attempt at mediation failed, and the General Sessions Court heard the detainer action in April of 2021. The General Sessions Court ruled in favor of Mr. Brown, awarding possession of the building, unpaid rent, and costs. The General Sessions Court, however, declined to award any compensation in connection with the damage done to the building.

Mr. Cannistra timely appealed to the Giles County Circuit Court. A trial was held in June of 2021. During the trial, one of the most important points of division between the parties was over a written lease agreement. Mr. Cannistra insisted the document which he had brought to court

---

[1] In cross-examination in Giles County Circuit Court, Mr. Cannistra conceded that the document that he purported to be the valid lease included a checked box which ascribed responsibility for air conditioning costs to the tenant.

for the trial, and which he had similarly brought before the General Sessions Court, was the parties' authentic, original lease agreement signed at the Home Depot in March of 2017. Mr. Brown was adamant that the document Mr. Cannistra brought to court was not the same document he had signed. Mr. Brown asserted that the document he signed at Home Depot had been a short basic lease agreement, while the document Mr. Cannistra questioned him about during the trial was elaborate, with multiple extra pages and numerous provisions that were not part of the original lease according to Mr. Brown. The purported signed lease agreement was much discussed during the trial proceeding testimony, but Mr. Cannistra, who was proceeding pro se, never actually sought to admit the lease agreement into evidence as an exhibit before the Giles County Circuit Court.[2]

In its July 2021 final order, the trial court expressly found Mr. Brown's testimony to be credible. The trial court determined the parties' initial agreement had been for four hundred dollars a month during the period while the restaurant was being constructed but increased to six hundred dollars a month following the determination that no new building would be constructed and that Mr. Cannistra would instead operate the restaurant out of the rental location on a more permanent basis. Having considered the parties' sharply conflicting testimony, the trial court found Mr. Brown's description of the parties' agreement to be more convincing than Mr. Cannistra's description. As a result, Mr. Cannistra's assertion that Mr. Brown's claim was overinflated did not persuade the Giles County Circuit Court. The trial court's conclusion did work in Mr. Cannistra's favor in one regard. The trial court, which found no evidence to support that Mr. Cannistra had personally caused the damage to the wall, leaned on the nature of the parties' agreement in declining to award compensation for damages to the wall. The trial court issued a judgment of $9,800 for past due rent and awarded costs.

Mr. Cannistra filed a notice of appeal in this court in July of 2021. In response to filings by Mr. Cannistra seeking more time, this court granted various extensions, including those related to filing the trial transcript and his appellate brief. This court denied Mr. Cannistra's requests for further extensions as well as requests for additional time to amend and supplement his brief, which was not filed until July 20, 2022. Mr. Brown did not challenge the circuit court's determination in declining to award compensation in connection with the damages to the structure.

II.

Mr. Cannistra is representing himself in this appeal as he did in the Giles County General Sessions and Circuit Courts. Pro se litigants "are entitled to fair and equal treatment by the courts." *Vandergriff v. ParkRidge E. Hosp.*, 482 S.W.3d 545, 551 (Tenn. Ct. App. 2015). Courts should be mindful that pro se litigants often lack any legal training and many are unfamiliar with the justice system. *State v. Sprunger*, 458 S.W.3d 482, 491 (Tenn. 2015). Accordingly, courts should afford some degree of leeway in considering the briefing from a pro se litigant, *Young v. Barrow*, 130 S.W.3d 59, 63 (Tenn. Ct. App. 2003), and should consider the substance of the pro se litigant's filing. *Poursaied v. Tennessee Bd. of Nursing*, 643 S.W.3d 157, 165 (Tenn. Ct. App. 2021). Pro se litigants, however, may not "shift the burden of litigating their case to the courts." *Whitaker v.*

---

[2] The document is contained in the technical record, but it was not admitted into evidence as an exhibit before the circuit court.

- 4 -

*Whirlpool Corp.*, 32 S.W.3d 222, 227 (Tenn. Ct. App. 2000). Additionally, "[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct*, 301 S.W.3d 603, 615 (Tenn. 2010). In considering appeals from pro se litigants, the court cannot write the litigants' briefs for them, create arguments, or "dig through the record in an attempt to discover arguments or issues that [they] may have made had they been represented by counsel." *Murray v. Miracle*, 457 S.W.3d 399, 402 (Tenn. Ct. App. 2014). It is imperative that courts remain "mindful of the boundary between fairness to a pro se litigant and unfairness to the pro se litigant's adversary." *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003).

With this framework in mind, this court discerns two interrelated arguments that emerge from Mr. Cannistra's appellate brief.[3] One, he contends the trial court should have placed greater weight on the purported written lease agreement that was discussed during the trial proceeding. Two, Mr. Cannistra contends, pointing to a variety of alleged inconsistencies in Mr. Brown's testimony, that he is a more credible witness than Mr. Brown.

These arguments are ultimately unavailing for the same fundamental reason. The trial court's conclusions and weighing of the evidence presented in this case hinge upon credibility determinations that are adequately supported by the record. "One of the most time-honored principles of appellate review is that trial courts are best situated to determine the credibility of the witnesses and to resolve factual disputes hinging on credibility determinations." *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). As stated by the Tennessee Supreme Court, "[w]hen it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are 'uniquely positioned to observe the demeanor and conduct of witnesses.'" *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citations omitted). In conducting this deferential review, "a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn.

---

[3] Counsel for Mr. Brown appropriately and ably demonstrates that Mr. Cannistra's brief is not in compliance in multiple respects with Tennessee Rule of Appellate Procedure 27. Mr. Cannistra's pro se status does not excuse failure to comply with Rule 27. *Gibson v. Bikas*, 556 S.W.3d 796, 803 (Tenn. Ct. App. 2018). This Court has dismissed appeals for non-compliance with Rule 27. *See, e.g., Anderson v. White*, No. M2021-00887-COA-R3-CV, 2022 WL 2444952, at *1 (Tenn. Ct. App. July 5, 2022); *Jefferson v. Williams-Mapp*, No. W2021-01058-COA-R3-CV, 2022 WL 1836926, at *1 (Tenn. Ct. App. June 3, 2022); *Thigpen v. Estate of Smith*, No. M2020-01015-COA-R3-CV, 2022 WL 702144, at *1 (Tenn. Ct. App. Mar. 9, 2022). There is, however, a public policy preference for addressing appeals on the merits. *See, e.g., Lacy v. Hallmark Volkswagen Inc. of Rivergate*, No. M2016-02366-COA-R3-CV, 2017 WL 2929502, at *3 (Tenn. Ct. App. July 10, 2017); *Patterson v. State*, No. M2016-01498-COA-R3-CV, 2017 WL 1103042, at *1 (Tenn. Ct. App. Mar. 24, 2017). This court has discretion to consider a case that could be subject to dismissal for violation of Rule 27 on the merits. *See, e.g., Finley v. Wettermark Keith, LLC*, No. E2020-01081-COA-R3-CV, 2021 WL 3465865, at *3 n.1 (Tenn. Ct. App. Aug. 6, 2021); *Weakley v. Franklin Woods Cmty. Hosp.*, No. E2020-00591-COA-R3-CV, 2020 WL 7861248, at *3 (Tenn. Ct. App. Dec. 22, 2020). In this case, there is no prejudice to the opposing party nor to the administration of justice given the relatively straight-forward nature of the legal analysis of Mr. Cannistra's contentions in this appeal. Given the aforementioned, this Court exercises its discretion to consider the merits of Mr. Cannistra's arguments on appeal.

2012).

The trial court's assessment of the evidence both in terms of the weight given to the purported written lease agreement and the conflicting testimony of Messrs. Cannistra and Brown turns upon the same fulcrum – the assessment of the credibility of the two litigants. The weight assigned to the purported lease agreement turns upon this fulcrum because if the written document is not the parties' actual lease, then its evidentiary worth is less than the value of the paper it is printed upon.

Messrs. Cannistra and Brown offered in their in-person testimony sharply divergent accounts of the parties' agreement, including whether the document Mr. Cannistra brought to trial was, in fact, the same lease agreement the parties had signed in March of 2017. The trial court found Mr. Brown to be credible, thereby accrediting the testimony that the written document addressed in the trial testimony was not, in fact, the agreement the parties had signed in 2017. The trial court also observed that the written document in Mr. Cannistra's possession, though much discussed and repeatedly referred to during the course of the trial, was never actually entered into evidence as an exhibit in the case.

Having reviewed the record in this case, we simply cannot find that the evidence runs contrary in a clear and convincing manner to the conclusion reached by the trial court. Mr. Brown's testimony offered a coherent explanation of the parties' agreement and Mr. Cannistra's violation thereof. In Mr. Brown's rendition of events, the lease amount increased to six hundred dollars a month to account for the more permanent usage of the property rather than to cover the costs of Mr. Brown acquiring additional insurance on the property. Mr. Cannistra then encountered financial difficulties and stopped regularly making payments. This rendition of events is also consistent with an exhibit admitted into evidence by Mr. Brown, but which was originally prepared by Mr. Cannistra, providing an accounting of the rent payments that were made. This document reflects that when Mr. Cannistra did make payments he continued to do so in the amount of six hundred dollars. Mr. Brown's rendition is also consistent with the portion of Ms. Cannistra's testimony in which she indicated the Cannistras had been experiencing financial difficulties. Mr. Cannistra offered a contrary explanation of the parties' agreement. His rendition of events, most notably that the two-hundred-dollar increase was solely to cover insurance on the property that was never obtained by Mr. Brown, does not as naturally square with the course of the payment history in the accounting he prepared. The trial court observed both litigants testify in person and made a credibility determination between the two. In light of the evidence presented in the case, this court would be grossly and improperly overstepping its role by overturning the well-considered determination of the trial court.

III.

For the reasons discussed above, we affirm the judgment of the Giles County Circuit Court. Costs of the appeal are taxed to Joseph Cannistra, the appellant, for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

_____

JEFFREY USMAN, JUDGE