IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 17, 2025 Session

## MATTHEW L. ARMITAGE v. ANDREA L. KASULIS

**Appeal from the Circuit Court for Knox County**
**No. 160792    Gregory S. McMillan, Judge**

_____

**No. E2024-01906-COA-R3-CV**

_____

A trial court declined to grant an ex parte order of protection. Following the subsequent contested hearing over whether to issue an order of protection, the trial court did not determine whether the petitioner had proven by a preponderance of the evidence the underlying offense predicate for issuance of an order of protection pursuant to Tennessee Code Annotated section 36-3-605(b). Instead, the trial court determined that issuance of an order of protection was unwarranted because the petitioner had failed to prove ongoing existing danger posed by the alleged perpetrator. In reaching this conclusion, the trial court, while noting a seeming tension between this approach and the language of Tennessee Code Annotated section 36-3-605(b), concluded the result followed from this court's decision in *Dulaney v. Chico*, No. E2022-00047-COA-R3-CV, 2023 WL 2253373 (Tenn. Ct. App. Feb. 28, 2023). Noting that this court's prior decision is unpublished, the petitioner appeals, asserting that the trial court's approach is inconsistent with the statute. While our understanding of the statutory scheme diverges from that set forth in *Dulaney v. Chico*, we affirm the trial court's decision. We do so because we conclude that the absence of existing ongoing danger is a proper consideration under Tennessee Code Annotated section 36-3-605(b) when no ex parte order has been issued and because the trial court properly understood its discretion in this case.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

JEFFREY USMAN, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, J., joined. JOHN W. MCCLARTY, J., filed a separate concurring opinion.

E. Joy Radice, JoAnn Lehberger, Evan Harrelson, Gable Willis, Briana Zimmerman, and Nicholas Slusher,[1] Knoxville, Tennessee, for the appellant, Matthew L. Armitage.

_____

[1] Mr. Harrelson, Mr. Willis, Ms. Zimmerman, and Mr. Slusher participated in this case as qualified law students pursuant to the authority in Tennessee Supreme Court Rule 7, Section 10.03. Mr. Slusher argued on the Appellant's behalf at oral argument.

Ann C. Short, Knoxville, Tennessee, for the appellee, Andrea L. Kasulis.

**OPINION**

I.

Matthew Armitage was simultaneously romantically involved with two women, Ginny Hale and Andrea Kasulis. At the time, both thought they were in an exclusive intimate relationship with Mr. Armitage. Neither was aware that Mr. Armitage was also in an intimate relationship at the same time with the other woman.

Both were extremely upset when they discovered Mr. Armitage's infidelity; they decided to confront him. Ms. Hale drove Mr. Armitage to her home under the guise of asking him to fix her computer. Instead, upon his entry into the home, Ms. Hale revealed Ms. Kasulis, and the two women proceeded to upbraid Mr. Armitage over the course of approximately twenty minutes. The interaction was recorded on audio and also in part on video by a third woman, who was apparently present for the purpose of recording the encounter. Much of this confrontation consisted of Ms. Hale and Ms. Kasulis emphasizing the wrongfulness of Mr. Armitage's conduct, illustrating the emotional harm his actions had caused them, and outlining the risks he had exposed them to through his dishonesty. During this interaction, the women were also consuming shots of alcohol.

Mr. Armitage asserted that the women also made threats against him. The threats he found "most terrifying" were threats to inform his family, his best friend, and his employer of his actions.[2] Mr. Armitage additionally asserts, however, that the women also made physical threats against him. Ms. Kasulis told Mr. Armitage that, due to her preexisting health conditions, his dishonesty put her life in danger. Ms. Hale chimed in, "Put his own life in danger, because when Sophia ever comes home and sees him in public it's going to be on sight."[3] The record does not reveal the identity of Sophia. Ms. Kasulis also confronted Mr. Armitage about his sharing information which she felt might put her in danger from a violent acquaintance, and Ms. Hale added, "We could fix the beating tonight if you wanted to." Ms. Hale also stated, "You better start praying to God you never run into my family or Sophia in . . . public." Ms. Hale then noted that her father disapproved of Mr. Armitage but was "a nice enough man to not beat the living shit out of

---

[2] While he used the term "blackmail," it does not appear that Mr. Armitage alleged the women wanted something in exchange for their silence; rather, it appears Ms. Hale and Ms. Kasulis merely expressed an intention to share his misdeeds. *See Blackmail*, Black's Law Dictionary (12th ed. 2024) (defining "blackmail" to include "making one or more threatening demands without justification" or "coercing someone by threats of public exposure or criminal prosecution").

[3] We infer that "on sight" is a reference to immediate physical confrontation.

you." Ms. Kasulis responded, "My dad, not so much." Ms. Kasulis elaborated that Mr. Armitage was playing "a dangerous game" because Ms. Kasulis's father had suffered a traumatic brain injury. Ms. Hale stated, shortly after, "I don't think we should threaten him on the recording again."

Mr. Armitage testified that he did not believe he could leave the home during the confrontation because Ms. Kasulis positioned herself between him and the door and because Ms. Hale was to his side, blocking any other exit. He acknowledged that he never actually tried to leave, was never told he could not leave, and that he had his phone in his hand during the confrontation but did not try to summon assistance. The confrontation ended with Ms. Kasulis asking, "You really want to keep doing this?" Mr. Armitage replied in the negative, and Ms. Kasulis concluded, "Then there's the door."

Mr. Armitage exited the home and called his parents for a ride. Having walked away from the house, he subsequently saw the three women driving past him, which prompted him to change directions. He was sitting at an intersection, waiting for his parents, when Ms. Hale pulled up in her car alone and "demanded" that he get in. Mr. Armitage declined, but she continued to insist that he get into her vehicle. Ms. Hale then "[sped] off." A couple of minutes later, he heard a car door slam and saw Ms. Hale coming toward him, again demanding that he get in the car. As Mr. Armitage walked away, he heard keys jingling and saw Ms. Hale running toward him. Mr. Armitage then ran to his parents' car, which was just arriving at that moment. A brief audio recording captures Ms. Hale demanding that Mr. Armitage get in her car and expressing an intention to "get[] [him] home."

During the confrontation in the house, Ms. Kasulis told Mr. Armitage that he would never see her again. Likewise, after the events of the evening, Ms. Hale texted Mr. Armitage that she was "blocking" him, stating that she had not wanted to "chase" him through the street. Mr. Armitage understood her statement that she was "blocking" him to mean she did not want to see him anymore or have "anything to do" with him. He confirmed that Ms. Hale did in fact "block" him and that neither woman had contacted him between the night of the confrontation on September 10 and the November 21 hearing. Ms. Hale's father did, however, have some contact with Mr. Armitage's mother.

Mr. Armitage sought ex parte orders of protection against both Ms. Hale and Ms. Kasulis. The trial court granted the ex parte order of protection as to Ms. Hale but declined to grant an ex parte order of protection as to Ms. Kasulis. Accordingly, the trial court at the joint contested hearing had to determine whether to extend or dissolve the ex parte order of protection that had been granted to Mr. Armitage against Ms. Hale and whether to grant in the first instance an order of protection to Mr. Armitage against Ms. Kasulis.

Following the contested joint hearing, the trial court's findings were not definitive regarding whether Mr. Armitage had established by a preponderance of the evidence a

predicate act for the issuance of an order of protection against either Ms. Hale or Ms. Kasulis. At the time, the potential statutory predicates which could result in extension or issuance of an order of protection included "domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense." Tenn. Code Ann. § 36-3-605(b) (effective July 1, 2022, to Mar. 24, 2025).[4]

The court found that Mr. Armitage was brought to Ms. Hale's house under subterfuge and that the actions of Ms. Hale and Ms. Kasulis were an attempt to intimidate him. Regarding whether Mr. Armitage was physically restrained, the court found:

> Now, these women are not — they're not sufficiently muscular or tall enough that they would constitute an inability to leave if he would, but he'd have to get up and risk physical confrontation to leave based on where they're bracing him. I do believe that he was held against his will until they had their say today and that was their intention to hold him against his will until they had their say.

Regarding Ms. Hale, the court initially stated that it would "arguably" grant an order of protection:

> While I would grant, arguably, an order of protection against Ms. Hale largely due to her actions pursuing and chasing him after he said — after they both said, we want nothing more to do with you, and he says, I don't want to be here anymore, I'm done with this and walks out the door and makes it clear he wants to be left alone. She then gets in her car and pursues and chases him. He tells me, and I haven't heard from them, that they were doing shots during this time. He's not going to get in a car with somebody who's been drinking and mad at him. I have every belief that that substantially increased his fear of being held.

Regarding Ms. Kasulis, the trial court expressed hesitation in connection with issuance of an order of protection: "Ms. Kasulis holding against the will. That's a tighter case."

The trial court ultimately concluded that it was unnecessary to determine whether the underlying statutory predicate offense for extension of an ex parte order of protection or issuance of an order of protection was proven. The court instead found that this case was resolved based upon an absence of an ongoing existing danger to Mr. Armitage from Ms. Hale and Ms. Kasulis. The court observed that the parties were "not attending the

---

[4] In 2025, the General Assembly amended Tennessee Code Annotated section 36-3-605(b) as follows: "Tennessee Code Annotated, Section 36-3-605(b), is amended by deleting the language 'or a human trafficking offense' wherever it appears and substituting 'a human trafficking offense, observation without consent, or unlawful photography.'" 2025 Tenn. Pub. Acts, c. 62, § 7, eff. March 25, 2025. This amendment is not of consequence to the resolution of the issues before the court in the present case.

- 4 -

same university. They don't work at the same place. They don't live in the same area of town. Outside of the relationship that he was pursuing with them individually they don't have the same friends, contacts." The court also gave weight to the fact the women had not attempted to contact Mr. Armitage since the evening of the confrontation. To the extent that Mr. Armitage raised concerns about threats to tell others about his conduct, the trial court did indicate that this particular basis for an order of protection would be unavailing "as a prior restraint of speech."

Ultimately, the trial court's conclusion that there was a lack of ongoing existing danger was what proved to be critical to the trial court's decision to decline to extend the ex parte order of protection as to Ms. Hale or to issue an order of protection as to Ms. Kasulis. The trial court's understanding was derived from its reading of this court's unpublished decision in *Dulaney v. Chico*, No. E2022-00047-COA-R3-CV, 2023 WL 2253373 (Tenn. Ct. App. Feb. 28, 2023). The trial court judge in the present case is the same judge whose ruling was before this court in *Dulaney v. Chico*. In ruling in the present case, the court articulated its understanding of the effect of *Dulaney v. Chico*:

> But [*Dulaney v. Chico*] was a fairly big change in what the order of protection law was. In the past I treated a finding of fact granting a bas[i]s as a command to shall issue. And that's what the statute says, what the Court of Appeals says, that if I don't think there is an ongoing existing danger, that there doesn't have to be an order of protection.

In addressing this matter, the trial court did not make a distinction between extension of the ex parte order of protection against Ms. Hale and issuance of an order of protection against Ms. Kasulis.

Mr. Armitage appealed the dismissal of both orders of protection. This appeal concerns the trial court's decision to decline to issue an order of protection against Ms. Kasulis, while the decision to decline to extend an ex parte order of protection as to Ms. Hale is appealed in *Matthew L. Armitage v. Ginny Hale*, No. E2024-01905-COA-R3-CV. Mr. Armitage stated the issues that he is raising on appeal in the case involving Ms. Kasulis as follows:

1. Whether the trial court's order dismissing Mr. Armitage's petition should be reversed because Mr. Armitage proved domestic abuse: Ms. Kasulis held him against his will, repeatedly threatened him, and chased him in a vehicle.

2. Whether the trial court's order dismissing the petition should be reversed because it was based on the trial court's incorrect view that this Court's unpublished decision in *Dulaney v. Chico*, No. E2022-00047-COA-R3-CV[, 2023 WL 2253373] (Tenn. Ct. App. Feb. 28, 2023), requires petitioners

seeking orders of protection not only to satisfy the statutory requirements of Tenn. Code Ann. § 36-3-605, but also to prove an "ongoing existing danger."

3. Whether the trial court's order dismissing the petition should be reversed because, even if petitioners must do more than satisfy the statute, Mr. Armitage proved an "ongoing existing danger."

## II.

In considering Mr. Armitage's arguments on appeal, we note that Tennessee appellate courts review a trial court's factual findings in a non-jury case "de novo on the record with a presumption of correctness . . . unless the evidence preponderates otherwise." *Phillips v. Hatfield*, 624 S.W.3d 464, 473-74 (Tenn. 2021); *Thomas v. Smith*, 682 S.W.3d 213, 222 (Tenn. Ct. App. 2023); Tenn. R. App. P. 13(d). However, a trial court's "determinations on issues of law" are "afford[ed] no deference" and instead are "review[ed] de novo with no presumption of correctness." *Youree v. Recovery House of E. Tennessee, LLC*, 705 S.W.3d 193, 202 (Tenn. 2025). "Statutory interpretation is a question of law, which is reviewed de novo with no presumption of correctness." *Jones by & through Sons v. Life Care Centers of Am.*, 715 S.W.3d 257, 264 (Tenn. 2025).

## III.

At the heart of Mr. Armitage's appeal is his contention that imposition of a requirement to prove ongoing existing danger adds an element that does not exist in the order of protection statute. Furthermore, he argues that the addition of this element contradicts the mandatory language of the order of protection statute which he asserts requires issuance of an order of protection where the predicate offense has been proven by a preponderance of the evidence. Ms. Kasulis counters that the trial court's decision is entirely consistent with this court's decision in *Dulaney v. Chico*, No. E2022-00047-COA-R3-CV, 2023 WL 2253373 (Tenn. Ct. App. Feb. 28, 2023). Mr. Armitage emphasizes that the *Dulaney v. Chico* decision is unpublished[5] and that the decision addressed an extremely unusual circumstance that is distinguishable from the circumstances before the court in the present case. He also argues that imposing such a requirement contradicts the plain and mandatory language of the statute.

This court in *Dulaney v. Chico* offered, and the concurring opinion in present case offers, a thoughtful and well-considered approach to understanding the issuance and extension of orders of protection. While we ultimately arrive at the same destination as the

---

[5] Tennessee Supreme Court Rule 4(G)(2) provides that "[o]pinions reported in the official reporter . . . shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction." Alternatively, Tennessee Supreme Court Rule 4(G)(1) states that "[u]nless designated 'Not For Citation,' 'DCRO' or 'DNP' pursuant to subsection (E) of this Rule, unpublished opinions for all other purposes shall be considered persuasive authority."

*Dulaney v. Chico* Court in the present case, we do so by a different route, marked by a different understanding of the order of protection statutory scheme. We ultimately conclude that while the statutory language mandates extending an already issued ex parte order of protection when the predicate offense is proven by a preponderance of the evidence, the statutory scheme does not mandate issuance of an order of protection where no ex parte order of protection had been issued. Though our reading of the statute, respectfully, diverges from that in *Dulaney v. Chico*, we nevertheless conclude that the trial court's decision to decline to issue an order of protection as to Ms. Kasulis should be affirmed.

IV.

The Tennessee Supreme Court has explained the undertaking of statutory interpretation as follows:

> This Court's role in statutory interpretation is "to determine what a statute means." Specifically, we must decide "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Original public meaning is discerned through consideration of the statutory text in light of "well-established canons of statutory construction."
>
> We give the words of a statute their "natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." In the absence of statutory definitions, we look to authoritative dictionaries published around the time of a statute's enactment.
>
> We consider the whole text of a statute and interpret each word "so that no part will be inoperative, superfluous, void or insignificant." We also consider "[t]he overall statutory framework." "[S]tatutes 'in pari materia'— those relating to the same subject or having a common purpose—are to be construed together . . . ."

*State v. Deberry*, 651 S.W.3d 918, 924-25 (Tenn. 2022) (internal citations omitted).

The statutory epicenter of the present case is found at Tennessee Code Annotated section 36-3-605. The operative statutory language provides as follows:

> (a) Upon the filing of a petition under this part, the courts may immediately, for good cause shown, issue an ex parte order of protection. An immediate and present danger of abuse to the petitioner shall constitute good cause for purposes of this section.

- 7 -

(b) Within fifteen (15) days of service of such order on the respondent under this part, a hearing must be held, at which time the court shall either dissolve any ex parte order that has been issued, or shall, if the petitioner has proved the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence, extend the order of protection for a definite period of time, not to exceed one (1) year, unless a further hearing on the continuation of such order is requested by the respondent or the petitioner; in which case, on proper showing of cause, such order may be continued for a further definite period of one (1) year, after which time a further hearing must be held for any subsequent one-year period. Any ex parte order of protection must be in effect until the time of the hearing, and, if the hearing is held within fifteen (15) days of service of such order, then the ex parte order must continue in effect until the entry of any subsequent order of protection issued pursuant to § 36-3-609. If no ex parte order of protection has been issued as of the time of the hearing, and the petitioner has proven the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence, then the court may, at that time, issue an order of protection for a definite period of time, not to exceed one (1) year.

Tenn. Code Ann. § 36-3-605.

Under the plain text of the statute, "[w]ithin fifteen (15) days of service of" an ex parte order of protection "on the respondent under this part, a hearing must be held." Tenn. Code Ann. § 36-3-605(b). At that hearing "the court shall either dissolve any ex parte order that has been issued, or shall . . . extend the order of protection for a definite period of time, not to exceed one (1) year . . . ." *Id.* As for which of the two courses the court should take, the General Assembly has directed that "if the petitioner has proved the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence," then "the court . . . shall . . . extend the order of protection for a definite period of time, not to exceed one (1) year." *Id*.

The General Assembly, however, enacted a different approach for circumstances in which no ex parte order of protection was issued prior to the hearing. *See id.* The statute provides that "[i]f no ex parte order of protection has been issued as of the time of the hearing, . . . then the court may, at that time, issue an order of protection for a definite period of time, not to exceed one (1) year." *Id*. The court "may, at that time, issue an order of protection" under the statute "[i]f . . . the petitioner has proven the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence." *Id*.

As noted above, the trial court judge in the present case is the same judge whose ruling was before this court in *Dulaney v. Chico*. In ruling in the present case, the trial court judge made the following observation:

> But [*Dulaney v. Chico*] was a fairly big change in what the order of protection law was. In the past I treated a finding of fact granting a bas[i]s as a command to shall issue. And that's what the statute says, what the Court of Appeals says, that if I don't think there is an ongoing existing danger, that there doesn't have to be an order of protection.

We agree with the trial court's reading that the statute sets forth a "shall issue" command to Tennessee courts. However, we understand that "shall issue" command as applying where an ex parte order of protection has been issued, not to circumstances like Ms. Kasulis's, where no ex parte order of protection was issued against her.

Under the plain language of Tennessee Code Annotated section 36-3-605(b), an order of protection requires as a foundational predicate that the petitioner prove "the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence." The statute, however, treats orders of protection differently depending upon whether an ex parte order of protection has been issued prior to the hearing. *See id.* If the aforementioned foundational predicate is proven and an ex parte order of protection has been issued, then "the court . . . *shall* . . . extend the order of protection for a definite period of time, not to exceed one (1) year." *Id.* (emphasis added). Alternatively, "[i]f no ex parte order of protection has been issued as of the time of the hearing, . . . then the court *may*, at that time, issue an order of protection for a definite period of time, not to exceed one (1) year." *Id.* (emphasis added).

When interpreting statutes, "[t]he traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive." Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 112 (2012). Tennessee courts have embraced this traditional rule. *See, e.g., State v. Cavin*, 671 S.W.3d 520, 526 (Tenn. 2023) ("The General Assembly's use of the term 'may' in this context rather than 'shall' is significant. 'May' is a permissive term and gives a trial court discretion . . . ."); *Emory v. Memphis City Sch. Bd. of Educ.*, 514 S.W.3d 129, 144 n.11 (Tenn. 2017) ("In general, use of the word 'shall' in a statute indicates that the statutory provision is mandatory, not discretionary."); *Bellamy v. Cracker Barrel Old Country Store*, Inc., 302 S.W.3d 278, 281 (Tenn. 2009) ("When 'shall' is used in a statute or rule, the requirement is mandatory."); *Stubbs v. State*, 393 S.W.2d 150, 154 (Tenn. 1965) ("When the word 'shall' is used . . . it is ordinarily construed as being mandatory and not discretionary."); *Colella v. Whitt*, 308 S.W.2d 369, 371 (Tenn. 1957) ("'May' ordinarily connotes discretion or permission; and it will not be treated as a word of command unless there is something in the context or subject matter of the act or statute under consideration to indicate that it was used in that sense."); *Creative Kitchens & Interiors, Inc. v. Bale*, No. 03A01-9611-CH-00379, 1997 WL 527281, at *5 (Tenn. Ct.

App. Aug. 26, 1997) ("The statutory language is *permissive* rather than mandatory, as is evidenced by its provision that the trial court 'may'—as opposed to 'shall'— . . . ."). As reflected in the above cited decisions, which span nearly three-quarters of a century of Tennessee jurisprudence, this understanding of "shall" as mandatory and "may" as permissive was the contemporaneous understanding of this language in 1979 when the General Assembly first enacted the legislation at issue and provided for a shall/may distinction depending upon whether an ex parte order of protection had been issued prior to the hearing.[6] This has remained the contemporaneous understanding of the language through every subsequent amendment to the statute.

Accordingly, given the ordinary meaning of the shall/may distinction, under the plain language of the statute, the trial court is without discretion and must extend the order of protection if there is an existing ex parte order of protection in place and the foundational predicate is met. Tenn. Code Ann. § 36-3-605(b). That is, the court must extend the order of protection if there is an ex parte order of protection in place and the petitioner proves "the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence." *Id.* Alternatively, "[i]f no ex parte order of protection has been issued as of the time of the hearing, . . . then the court *may*, at that time, issue an order of protection for a definite period of time, not to exceed one (1) year." *Id.* (emphasis added).

V.

The *Dulaney v. Chico* Court's divergent reading of the statute rests upon two legs: (1) a purported inconsistency with the purpose of the statute and (2) a purported inconsistency with this court's decision in *Autry v. Autry*, 83 S.W.3d 785 (Tenn. Ct. App. 2002). The concurring opinion adds a third leg, noting the significant adverse consequences that arise for a person against whom an order of protection is entered. While these rationales offer a thoughtful and inviting approach to understanding the issuance of orders of protection, in our view, none is sufficient to overcome the plain meaning of the operative language of the statute.

Turning first to the statutory purpose, this court in *Dulaney v. Chico* did not rely upon the operative language of Tennessee Code Annotated section 36-3-605(b). Rather, the focus in assessing purpose was instead upon Tennessee Code Annotated section 36-3-618. This latter statutory purpose provision provides as follows:

> The purpose of this part is to recognize the seriousness of domestic abuse as a crime and to assure that the law provides a victim of domestic abuse with enhanced protection from domestic abuse. A further purpose of this chapter is to recognize that in the past law enforcement agencies have treated

---

[6] *See* 1979 Tenn. Pub. Acts ch. 350, § 5.

- 10 -

domestic abuse crimes differently than crimes resulting in the same harm but occurring between strangers. Thus, the general assembly intends that the official response to domestic abuse shall stress enforcing the laws to protect the victim and prevent further harm to the victim, and the official response shall communicate the attitude that violent behavior is not excused or tolerated.

Tenn. Code Ann. § 36-3-618.

When a court engages in statutory interpretation, purpose plays an important role. In *Colley v. Colley*, the Tennessee Supreme Court stated the following regarding the role of purpose in statutory interpretation:

> To interpret the statute, we focus on its text. "The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." "We presume that every word in a statute has meaning and purpose and that each word's meaning should be given full effect . . . ." We examine "the language of the statute, its subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment." A "cardinal rule of statutory construction is to effectuate legislative intent," and the rules of construction are aids to that end. "Our construction must be reasonable in light of the statute's purposes and objectives."

*Colley v. Colley*, 715 S.W.3d 293, 306 (Tenn. 2025) (internal citations omitted).

Respectfully, the *Dulaney v. Chico* decision relies upon reading the purpose provision in a manner that, in our view, exceeds how purpose is to be used when engaging in statutory interpretation. Addressing a statutory purpose provision, Judge Joan Larsen, writing for the Sixth Circuit, observed that "a purpose statement may be a useful guide to construing statutory language. But what a purpose provision cannot do is 'limit or expand the scope of the operative clause.'" *Commonwealth v. Biden*, 57 F.4th 545, 551-52 (6th Cir. 2023) (internal citations omitted). Similarly, the Eleventh Circuit stated that "purpose provisions 'can suggest only which permissible meanings of the enactment should be preferred' when the text is otherwise ambiguous." *Georgia v. President of the United States*, 46 F.4th 1283, 1300 (11th Cir. 2022). Ultimately, while a statutory purpose provision may help inform the interpretation of a statute, "[t]he purpose clause cannot override the operative language." Scalia and Garner at 220; *see also Sturgeon v. Frost*, 587 U.S. 28, 56-57 (2019) (noting that "statements of purpose . . . 'cannot override a statute's operative language'"). This understanding of the interconnection between purpose and text in statutory interpretation as informing, not overriding, is in accord with

the Tennessee Supreme Court's statutory interpretation directives.  *See Colley*, 715 S.W.3d at 306.

Various scholars and jurists, the latter both in scholarly works and judicial opinions, have offered insight into the dangers of abandoning textual analysis in the pursuit of serving the overarching purpose of a statutory scheme.  In addressing a textualist critique of purposivism, Professor John F. Manning observed that "[t]he design of the legislative process emphasizes the need for compromise, and compromises are often complex, awkward, and even incoherent—thus making it dangerous for judges to smooth over the details of an agreed-upon text to make it more coherent with its perceived purpose."  John F. Manning, *Competing Presumptions About Statutory Coherence*, 74 Fordham L. Rev. 2009, 2010 (2006).  Professor Manning has also noted that "[b]ecause statutory details may reflect only what competing groups could agree upon, legislation cannot be expected to pursue its purposes to their logical ends; accordingly, departing from a precise statutory text may do no more than disturb a carefully wrought legislative compromise."  John F. Manning, *Textualism and the Equity of the Statute*, 101 Colum. L. Rev. 1, 18 (2001).

In a similar vein, Justice Amy Coney Barrett has observed that legislatures "draw lines" and that "[e]xtending a statute to better accomplish its purpose takes the statute further than a majority" of the legislature actually "chose to go."  Amy Coney Barrett, *Listening to the Law: Reflections on the Court and Constitution* 217 (2025).  Justice Barrett added that a legislature "does not just choose an *end* – it also chooses a specific *means* of accomplishing that end."  *Id.*  As the United States Supreme Court has stated,

> The "plain purpose" of legislation, however, is determined in the first instance with reference to the plain language of the statute itself.  Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action.  Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises.  Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373-74 (1986).

This is, in part, because "compromise is inherent in the legislative process, and compromise typically dilutes statutory purpose."[7]  Overreading a general purpose provision

---

[7] Jonathan R. Siegel, *The Inexorable Radicalization of Textualism*, 158 U. Pa. L. Rev. 117, 125-26 (2009).

defeats the compromise, and "a compromise must be able to use words to specify just how far that decision has gone" even where the compromise is not consistent with the broadly stated purpose of the statute.[8]   As the United States Supreme Court has indicated, "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent . . . to assume that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States,* 480 U.S. 522, 526 (1987); *see also*, *e.g.*, *Stanley v. City of Sanford, Fla.*, 145 S. Ct. 2058, 2067 (2025) ("But it is 'quite mistaken to assume . . . that any interpretation of a law that does more to advance a statute's putative goal must be the law.' . . . 'Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known pursues its stated purpose at all costs.'"); *Erie Ins. Exch. by Stephenson v. Erie Indem. Co.*, 68 F.4th 815, 820 (3d Cir. 2023) ("But no legislation pursues its purposes at all costs," and "we are not free to rewrite this statute (or any other) as if it did.").

One of the best explications of the overarching takeaway from these considerations was offered by Justice Scalia, who observed that when interpreting a statute, the members of the court "are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, n. 4 (1994).  The same principle applies to Tennessee courts in considering the interrelationship between purpose and text.  Accordingly, while a statutory purpose informs the interpretation of text, it may not trump the operative text of the statute.

The *Dulaney v. Chico* Court relied primarily upon the following portion of the purpose provision in Tennessee Code Annotated section 36-3-618: "the general assembly intends that the official response to domestic abuse shall . . . *prevent further harm to the victim . . . .*" Tenn. Code Ann. § 36-3-618 (emphasis added).  As discussed above, purpose cannot trump operative language.  Additionally, it is evident that this purpose provision does not fully encapsulate the statutory scheme.  As but one illustration, the purpose provision only references "domestic abuse," doing so four times expressly, but it does not expressly reference "stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense," whose victims are also afforded protection through orders of protection. *Compare* Tenn. Code Ann. § 36-3-618 *with* Tenn. Code Ann. § 36-3-605(b).  In addition, a small shift in one's emphasis in considering the purpose provision can provide a different framing for the interpretation of the statutory language.  For example, the next clause of the purpose provision provides that "the official response shall communicate the attitude that violent behavior is not excused or tolerated." Tenn. Code

---

[8] John F. Manning, *Competing Presumptions About Statutory Coherence*, 74 Fordham L. Rev. 2009, 2041 (2006).

Ann. § 36-3-618.  Similarly, the first sentence of the purpose provisions provides that "[t]he purpose of this part is to recognize the seriousness of domestic abuse as a crime and to assure that the law provides a victim of domestic abuse with enhanced protection from domestic abuse."  Tenn. Code Ann. § 36-3-618.  Emphasis on either of these portions of the purpose provision may provide a different framing for considering the meaning of the statutory language – one that is more cautious so as to protect victims of domestic abuse.

Furthermore, the "prevent further harm to the victim" portion of the purpose provision is not actually inconsistent with the plain meaning of the operative language of Tennessee Code Annotated section 36-3-605.  As noted above, the General Assembly has drawn a shall/may distinction depending upon whether an ex parte order of protection is in place at the time of the hearing.  Under Tennessee Code Annotated section 36-3-605(a), a court may only grant an ex parte order of protection "for good cause shown" and "[a]n immediate and present danger of abuse to the petitioner shall constitute good cause."  Tenn. Code Ann. § 36-3-605(a).  Accordingly, under Tennessee Code Annotated section 36-3-605, the General Assembly has drawn a distinction between circumstances where a judge has recently found "[a]n immediate and present danger of abuse" and those circumstances where a judge has made no such determination prior to the hearing on the order of protection.  *See* Tenn. Code Ann. § 36-3-605.  Where a judge did make a determination that there was "[a]n immediate and present danger of abuse"  and an ex parte order of protection has been issued, the victim need only, under Tennessee Code Annotated section 36-3-605(b), prove "the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence" to obtain an extension of the order of protection.  Tenn. Code Ann. § 36-3-605.

Utilizing such an approach is part of a broad tapestry of legislative policy choices made by the General Assembly in connection with the significant and complex issues that arise in the lives of Tennesseans in relation to orders of protection.  In making policy in this area, the General Assembly necessarily navigates a complex balancing of risks and restrictions, of burdens and safeguards, within a domain of extraordinarily challenging interpersonal dynamics.  Through the express text of the statute, the General Assembly has provided for mandatory granting of an extension of an order of protection where there is an existing ex parte order of protection and the statutory predicate of "domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense" has been proven "by a preponderance of the evidence."  Tenn. Code Ann. § 36-3-605(b).  In doing so, the legislature is addressing a circumstance in which, shortly before the hearing, a judge has found "good cause" for issuance of an ex parte order of protection, including "[a]n immediate and present danger of abuse to the petitioner."  Tenn. Code Ann. § 36-3-605(a).

A judge may later come to a different conclusion as to whether such danger exists. Beneath Heaven, there is no such thing as perfection, but the General Assembly's statutory design makes a choice as to how to allocate the risk that the trial court erred in its initial or

- 14 -

subsequent finding as to immediate danger.  At contested hearings, victim witnesses, especially those who are now confronted by perpetrators of domestic abuse, stalking, sexual exploitation, sexual assault, or human trafficking, can become frightened, impacting their testimony; lawyers can perform at less than their best; and even excellent judges can make the wrong call in deciphering which way the evidence preponderates.  The General Assembly deciding to take a more cautious, victim-protecting, approach, where a court has recently made a finding of "good cause" to issue an ex parte protective order, is not inconsistent with the purpose of "prevent[ing] further harm to the victim."  It simply balances the burdens and safeguards in a manner more protective to victims, at the expense of imposition of restrictions on the perpetrator, where a judge had so recently found "good cause" to exist for issuance of an ex parte protective order.  In other words, the plain language of the statute is not inconsistent with the goal of preventing future harm to the victim.  Quite to the contrary, the mandatory extension of the order of protection simply balances the risks, burdens, and safeguards in more a cautious manner, favoring the victim over the perpetrator of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense.

If we were starting anew in a vacuum and determining whether an existing ongoing danger should be necessary to extend an ex parte order of protection, the *Dulaney v. Chico* Court's view might be a better policy and better serve the overarching statutory purpose.  Our point is not to disagree on either of those fronts; rather, our point is significantly narrower.  Even if the General Assembly's approach is not the best way of serving the overarching statutory purpose, it is the way the General Assembly decided to proceed.  And the General Assembly's way, irrespective of whether it is the best route, is consistent with the stated purpose of the legislation.[9]

Turning to the other leg upon which the *Dulaney v. Chico* Court stands, that the *Autry v. Autry*, 83 S.W.3d 785 (Tenn. Ct. App. 2002) decision dictates a contrary reading of the statute, we do not understand the *Autry* decision as displacing the plain language of the statute.  In *Dulaney v. Chico*, addressing *Autry*, this court stated the following:

> Importantly, "'an order of protection is appropriate **only where there is sufficient evidence that the victim needs the protection available**."'  *Autry v. Autry*, 83 S.W.3d 785, 787 (Tenn. Ct. App. 2002) (emphasis added)

---

[9] The statute does not specify a minimum for how long a trial court judge must extend the order of protection; rather, it provides that the statute mandates extending "the order of protection for a definite period of time, not to exceed one (1) year."  Tenn. Code Ann. § 36-3-605(b).  Thus, while a trial court must grant the order of protection, a trial court judge who has become convinced that there will not be a continuing need for the order of protection may, for example, elect to set a short time horizon to allow for a cooling off time period in the wake of a contested hearing while not imposing as substantial of a restriction.

(quoting *Collins* [*v. Pharris*], [No. M1999-00588-COA-R3-CV,] 2001 WL 219652, at *5 [(Tenn. Ct. App. Mar. 7, 2001)]).

*Dulaney*, 2023 WL 2253373, at *4. The *Dulaney v. Chico* Court views this language from *Autry* as meaning that the victim also had to prove an ongoing existing danger to obtain an extension of the ex parte order of protection.

For four reasons, we do not view *Autry* as being able to hold the weight that is being placed upon it. One, the assessment of whether the petitioner "needs the protection available" in the *Autry* case is not actually analyzed in terms of an additional requirement added to the statutory parameters that are set forth in Tennessee Code Annotated section 36-3-605. *See Autry*, 83 S.W.3d at 787-88. Rather, "[n]eed" in the *Autry* case is instead analyzed entirely within the bounds of what Tennessee Code Annotated section 36-3-605(b) expressly requires for an extension of an ex parte order of protection. *See id.* The *Autry* Court addressed the issue of whether the petitioner "needs the protection available" in relation to the appellant's argument "that the appellee failed to prove the allegations of domestic abuse by a preponderance of the evidence." *Id*. As noted above, under the plain language of Tennessee Code Annotated section 36-3-605(b), the mandatory extension of an order of protection is predicated upon the petitioner proving "the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence." The *Autry* Court applied "needs the protection available" in relation to whether this predicate was established — whether there was domestic abuse. *See Autry*, 83 S.W.3d at 787-88. Though the *Autry* Court utilized language that is subject to confusion, when actually applying the "needs" requirement, the Court did not impose any additional requirement beyond what the statute expressly demands. *See* Tenn. Code Ann. § 36-3-605(b).

Two, the underlying procedural history of the *Autry* case and the manner in which the appellate court understood and considered the law in relation to that procedural history are unfortunately muddled. For example, the *Autry* Court described the circumstances before the trial court as follows:

On June 10, 2001, there was a struggle between the parties over the child. The appellee sought an order of protection. A hearing was held on June 28, 2001, on Mrs. Autry's petition. Both parties were present at the hearing. After hearing the testimony, the trial court granted Mrs. Autry an order of protection . . . .

*Id*. at 786. In this rendition of the underlying procedural history of the case, there is no reference to Mrs. Autry seeking an ex parte order of protection nor to an ex parte order of protection having been granted. To the contrary, an order of protection was sought and granted, not through an ex parte process, but instead following a hearing at which both

parties were represented.  However, the *Autry* Court also described the procedural history as follows:

> On June 12, 2001, Mrs. Autry filed an Ex Parte Order of Protection against Mr. Autry stemming from the events that occurred on June 10, 2001.  A hearing was held on June 28, 2001 regarding Mrs. Autry's petition for an order of protection.  At the time of the hearing on the order of protection, a complaint for divorce on the grounds of irreconcilable differences was pending.

*Id*. at 786.  The *Autry* Court then proceeded to discuss conflicting testimony in relation to the events of June 10, 2001, Mr. Autry's income level, and testimony related to TennCare coverage without addressing the trial court's ruling or reasoning regarding the order of protection that had been sought.  *Id*. at 786-87.

The *Autry* Court then transitioned out of the procedural history and evidentiary discussion by noting, "[w]e now turn to whether the trial court erred in issuing the order of protection" and noting that the appellant's argument for error was that "the appellee failed to carry the statutory burden of proof" by failing to present sufficient evidence of domestic abuse.  *Id*. at 787.  However, in considering whether that standard had been satisfied, the *Autry* Court stated the question before it in terms of an ex parte order of protection.  *Id*. at 787.  The *Autry* court stated that "[t]o be entitled to an ex parte order of protection, a petitioner must show that 'good cause' for the protective order exists.  Tenn. Code Ann. § 36-3-605(a)."  *Id*. at 787.  Reflective of the confusion in the case, the publisher's editors in their synopsis[10] of the case indicated that "Wife filed a petition for order an order [sic] of protection against her husband," but also indicated that the trial court "granted wife an ex parte order or protection," that "Husband appealed," and that the *Autry* Court held that the evidence was "sufficient to support issuance of an ex parte protective order."  *Id*. at 785.

Simply stated, from reviewing *Autry*, it is not entirely clear what the underlying procedural history in the case was or how the appellate court understood that procedural history in framing the question before it.  This creates significant complications in fully apprehending the import of the *Autry* decision as applied to the issues before the court in the present case.

Three, the *Autry* Court did not engage with the questions that are before the court in the present case.  To the contrary, the *Autry* Court addressed the question of whether there was sufficient evidence to establish by a preponderance of the evidence that domestic abuse occurred.  *See Autry*, 83 S.W.3d at 787-88.  Beyond resolution of that question, the language of the opinion in this vein is dicta.  Furthermore, for more than a century,

---

[10] *Gutzke v. Gutzke*, 908 S.W.2d 198, 203 (Tenn. Ct. App. 1995) ("West's synopsis . . . is never considered part of a court's opinion.")

Tennessee courts have understood stare decisis as being narrower in its scope than would be necessary to pull *Autry* into being decisive in this case. As stated by the Tennessee Supreme Court, "[i]t is a familiar principle that stare decisis only applies with reference to decisions directly upon the point in controversy." *State v. Nashville Baseball Club*, 154 S.W. 1151, 1155 (Tenn. 1913); *see also*, *e.g.*, *Union Tr. Co. v. Williamson Cnty. Bd. of Zoning Appeals*, 500 S.W.2d 608, 614 (Tenn. 1973) (addressing stare decisis under Tennessee law and indicating that "for that doctrine to apply it is necessary that the issues or points in controversy be identical"). Accordingly, "[a] question which merely lurks in the record, neither brought to the attention of the Court nor ruled upon, is not to be considered as having been so decided as to constitute a precedent. Where an applicable rule (statute or common law) is overlooked in the decision of a case, such decision is not authority for the proposition that the rule is not to be applied in like cases in the future." *State ex rel. Harbin v. Dunn*, 282 S.W.2d 203, 212 (Tenn. Ct. App. 1943) (internal citations omitted).

Four, other case law points in a direction that diverges from the *Dulaney v. Chico* Court in its understanding of the operation of the statute. For example, in *Gibson v. Bikas*, a mother sought an order of protection for herself and for her children. 556 S.W.3d 796, 804 (Tenn. Ct. App. 2018). An ex parte order was granted as to the mother but denied as to the children. *Id.* *Gibson* noted that a party seeking the initial ex parte order "has a significant burden of proof; he or she must demonstrate '[a]n immediate and present danger of abuse to the petitioner.'" *Id.* at 805 (quoting *Cardwell v. Hutchinson*, No. E2009-02680-COA-R3-CV, 2010 WL 4810671, at *4 (Tenn. Ct. App. Nov. 24, 2010) (quoting Tenn. Code Ann. § 36-3-605(a))). However, a party seeking a modification or extension of an existing order under Tennessee Code Annotated section 605(b) has "a less onerous burden." *Id.* (quoting *Cardwell*, 2010 WL 4810671, at *4). Instead, "[t]he party seeking a modification or extension only needs to prove the allegation of domestic abuse, stalking or sexual assault by a preponderance of the evidence." *Id.* (quoting *Cardwell*, 2010 WL 4810671, at *4). The *Gibson* Court rejected the contention that a party seeking an extension of an ex parte order of protection had "to prove an immediate and present danger of abuse to obtain an extension or modification of the order." *Id.* Accordingly, in our view, neither of the legs on which the *Dulaney v. Chico* Court stands, the purpose provision and the *Autry* decision, dictate a result that overcomes the plain operative language of the statute.

As noted above, the concurring opinion adds a third leg in support of the understanding of the statutory scheme set forth in *Dulaney v. Chico*. The concurring opinion emphasizes the significant consequences for persons against whom orders of protection are issued. We agree fully with the concurrence that the consequences of issuance of an order of protection are significant. Were we legislators considering how best to balance the difficult policy questions that arise in connection with determining when an extension of an ex parte of protection is warranted, we may well follow the course thoughtfully argued for by the concurrence. Addressing the role of courts vis-à-vis the

- 18 -

General Assembly, the Tennessee Supreme Court, however, has made plain "that it is not our duty 'to alter or amend a statute, question the statute's reasonableness, or 'substitut[e] [our] own policy judgments for those of the legislature.'" *Falls v. Goins*, 673 S.W.3d 173, 184 n.8 (Tenn. 2023) (quoting *Griffin v. Shelter Mut. Ins. Co.*, 18 S.W.3d 195, 200-01 (Tenn. 2000)).

The consequences of granting or denying an order of protection are, in truth, significant for both a victim who is seeking to obtain an order of protection and the perpetrator of the underlying predicate offense against whom the order of protection is being sought. No extension of an ex parte order of protection or issuance of an order of protection is to be granted in the absence of a finding that the victim has carried his or her burden of proof as to the predicate offense. Tenn. Code Ann. § 36-3-605(b). That is, the petitioner must prove "the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence." *Id.* In circumstances in which a victim has shown good cause and obtained an ex parte order of protection, it may be better policy, a better balancing of protections versus restrictions, to require the victim to prove not only the predicate offense but also ongoing existing danger posed by the perpetrator. That is not, however, our understanding of what the General Assembly has provided for victims who have previously shown good cause and obtained an ex parte order of protection.

Ultimately, when an ex parte order of protection has been granted, the plain language of the statute requires the court to extend the ex parte order of protection if it finds "the allegation of domestic abuse, stalking, sexual exploitation of a minor, sexual assault, or a human trafficking offense by a preponderance of the evidence."[11] Tenn. Code Ann. § 36-3-605(b). On the other hand, when no ex parte order is in place, the trial court may exercise its discretion to determine whether to issue an initial order of protection. Where the decision to grant is discretionary, considering ongoing existing danger is entirely proper as part of the trial court's discretionary decision-making. After all, to issue an ex parte order of protection, the petitioner must show "good cause," and "[a]n immediate and present danger of abuse to the petitioner shall constitute good cause . . . ." Tenn. Code Ann. § 36-3-605(a). Where no ex parte order of protection has been granted, no such determination has yet been made.

## VI.

We turn next to considering what this understanding means for the present case. On appeal before this court, Mr. Armitage argues that the trial court erred by declining to grant him an order of protection against Ms. Kasulis based upon the trial court's finding that there was no ongoing existing danger. In support of his assertion of error, Mr. Armitage

---

[11] In *Dulaney v. Chico*, the appellant also raised the issue of laches as an equitable defense. In the present case, no such issue is before this court.

- 19 -

references this court's decision in *Gibson v. Bikas*, 556 S.W.3d 796 (Tenn. Ct. App. 2018), but *Gibson* undermines, rather than supports, his argument. As noted above, the *Gibson* Court indicated that "[a] party seeking a modification or extension of an existing order of protection . . . only needs to prove the allegation of domestic abuse, stalking or sexual assault by a preponderance of the evidence" and accordingly has "a less onerous burden." 556 S.W.3d at 805 (internal citations omitted). In addressing this matter, this court made it clear that it was addressing "the distinction between the burden of proof required to obtain an *ex parte* order of protection and that required to obtain an extension or modification of an *ex parte* order of protection . . . ." *Id.* Mr. Armitage, however, is endeavoring to read a standard applicable to extension of an ex parte order of protection ("shall issue") onto a "may issue" circumstance where no ex parte order of protection has been granted.

Where the decision to grant is discretionary rather than mandatory, it is entirely appropriate for a court to consider ongoing existing danger as part of its exercise of discretion in determining whether to issue an order of protection. *See id.* at 808 (considering whether the evidence supported the finding that there was abuse and an "ongoing threat" to the children, as to whom no ex parte order had issued). To issue an ex parte order of protection, the petitioner must show "good cause," and "[a]n immediate and present danger of abuse to the petitioner shall constitute good cause . . . ." Tenn. Code Ann. § 36-3-605(a). Where no ex parte order of protection has been granted prior to the hearing, no such determination has yet been made. In the absence of such a determination and where the statutory scheme affords the trial court discretion, in our view, a trial court does not err by considering a lack of ongoing existing danger as part of its reasoning in deciding whether or not to issue an order of protection. Accordingly, the trial court did not err in the present case by considering an absence of ongoing existing danger in making a discretionary decision as to whether to issue an order of protection against Ms. Kasulis.

VII.

Mr. Armitage also contends the trial court erred in its factual determination that there was not an ongoing existing danger. The Tennessee Supreme Court has described the standard of review in a non-jury case as follows:

> We review a non-jury case de novo on the record with a presumption of correctness as to the findings of fact of the trial court, unless the evidence preponderates otherwise. For evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect. Because the trial court is able to observe witnesses as they testify, appellate courts afford deference to the trial court's credibility assessments of live, in-court testimony.

- 20 -

*Phillips*, 624 S.W.3d at 473-74 (internal citations omitted). The court found that Ms. Kasulis and Mr. Armitage had "no ongoing relationship, no ongoing community ties, friends," and that they had no overlap in schooling, work, or place of residence. The trial court was persuaded from the evidence presented that they would not have further interaction. Based upon the record, there is no basis for finding error in the trial court's determination that there is not an ongoing existing danger in the present case.

Ultimately, given that there was no ex parte order of protection issued to Mr. Armitage against Ms. Kasulis, the trial court acted properly in exercising its discretion to decline to grant an order of protection under the circumstances of the present case. Therefore, we affirm the trial court's ruling denying Mr. Armitage an order of protection against Ms. Kasulis.

## VIII.

The concurring opinion offers, and the *Dulaney v. Chico* Court offered, a thoughtful and well-considered approach to the issuance and extension of orders of protection. From our reading of the statutory provisions, for the reasons discussed above, we cannot agree, however, that approach is the one set forth in Tennessee Code Annotated section 36-3-605. Unlike the case involving Ms. Hale, we arrive at same destination as the *Dulaney v. Chico* Court would but do so via a different route.

Our reasoning in the present case is admittedly in tension with this court's thoughtful decision in *Dulaney v. Chico*. The divergence between that decision and this one reflects conflicting interpretations of a statutory scheme that has a significant impact on lives of Tennesseans, creating both important protections and imposing significant restrictions. An appeal of both this case and the case involving Ms. Hale to the Tennessee Supreme Court may be well warranted to help provide a definitive interpretation of the statutory scheme.

For the above discussed reasons, we affirm the judgment of the circuit court. Costs of the appeal are taxed to the appellee, Matthew L. Armitage, for which execution may issue if necessary.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE